### UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| In re: | : | |
| | : | Chapter 7 |
| RICHARD PAUL GLUNK, | : | |
| | : | Bky. No. 05-31656-ELF |
| Debtor. | : | |
| | : | |
| | : | |
| DANIEL H. FLEDDERMAN and | : | |
| COLLEEN M. FLEDDERMAN, | : | |
| Co-Administrators of the Estate of | : | |
| Amy Marie Fledderman, | : | Adv. No. 05-700 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| RICHARD PAUL GLUNK, | : | |
| | : | |
| Defendant. | : | |

# O P I N I O N

## TABLE OF CONTENTS

I.    INTRODUCTION

II.   PROCEDURAL HISTORY

III.  FINDINGS OF FACT

        A. Dr. Glunk's Medical Background and Private Plastic Surgery Practice

        B. Dr. Glunk's Office Procedures For Surgical Consent Forms

-1-

C. Dr. Glunk Meets Amy Fledderman and Her Mother Prior to the 1999
Procedure

D. The Initial "Monitoring" Requirement Imposed in September-October 1999

E. The Modified "Monitoring" Requirement Imposed in May 2000

F. Dr. Glunk's Surgical Privilege Reappointment Request in August 2000

G. Dr. Glunk's Reappointment to the MLH Medical Staff in 2001

H. Amy Fledderman's 2001 Procedure

1. the May 15, 2001 Consultation

2. after the May 15, 2001 Consultation

3. the 2001 Procedure on May 23, 2001

I. Events Following the 2001 Procedure

IV.    DISCUSSION

A. Dischargeability Under §523(a)(2)(A)

B. The Alleged Fraudulent Misrepresentations

1. Did Dr. Glunk misrepresent that his private facility was as safe as
a hospital?

a. Dr. Glunk's hospital privileges

b. the Quad ASF requirements

c. procedures Dr. Glunk performed at his private facility

2. Did Dr. Glunk misrepresent his private facility as affiliated with
the MLH System?

3. Did Dr. Glunk make a material misrepresentation by failing to
disclose that his private office was not licensed by the

-2-

> Commonwealth of Pennsylvania?
>
> 4. **Did Dr. Glunk misrepresent the risks of the 2001 procedure?**
>
> 5. **Did Dr. Glunk make misrepresentations regarding the anesthesia services for the 2001 Procedure?**
>
>> a. **the presence of an anesthesiologist**
>>
>> b. **the type of anesthesia administered to Amy Fledderman**
>
> 6. **Did Dr. Glunk make misrepresentations concerning the 1999 Procedure**

## V.    CONCLUSION

# I. INTRODUCTION

Debtor Richard Paul Glunk ("Dr. Glunk") is a plastic surgeon.  On May 23, 2001, Dr. Glunk performed elective, liposuction surgery on an 18-year-old woman named Amy Fledderman (sometimes referred to as "Amy") at his private ambulatory surgical center in King of Prussia, Pennsylvania.  Amy Fledderman died two days later as a result of complications arising from the surgery.

On August 31, 2001, Amy's parents, Daniel Fledderman and Colleen Fledderman ("Mrs. Fledderman") (collectively, "the Plaintiffs"), filed a lawsuit ("the State Court Action") on behalf of their daughter's estate and themselves against Dr. Glunk in the Court of Common Pleas of Philadelphia County ("the C.P. Court").  After a jury trial, the C.P. Court entered judgment in favor of the Plaintiffs and against Dr. Glunk in the amounts of $3.525 million in compensatory

-3-

damages and $15.0 million in punitive damages.

In this adversary proceeding, the Plaintiffs seek a determination that their claim against Dr. Glunk is nondischargeable. The sole issue in this proceeding is whether the debt is nondischargeable under §523(a)(2)(A) of the Bankruptcy Code because it arose from "false pretenses, a false representation or actual fraud."

This decision on the nondischargeability issue may bring to a close nearly ten (10) years of litigation between Mr. and Mrs. Fledderman and Dr. Glunk.[1] My close observation of these parties over the course of a multi-day trial reveals why they have been entrenched in this painful, drawn-out conflict.

Mr. and Mrs. Fledderman were devastated, understandably, by the horror of losing their daughter following a relatively minor, elective, surgical procedure, which Dr. Glunk represented to be safe. Upon further investigation, they learned that Dr. Glunk's surgical skills were under scrutiny by his medical peers, that his surgical privileges at the hospitals in which he practiced were subject to some form of peer oversight or limitation and that the private office in which he conducted the surgery was not licensed as required by the Pennsylvania Department of Health ("DOH"). Their sense of outrage likely intensified when Dr. Glunk defended the State Court Action by disputing that he had committed malpractice.[2] I suspect that Mr. and Mrs.

---

[1]    I speak in the conditional voice due to the obvious fact that this decision is subject to appeal.

[2]    In fairness to Dr. Glunk, he represented to this court, as far back as 2006, that he had offered to settle the State Court Action by tendering the full value of his malpractice insurance policy. However, the policy was relatively small (approximately $1 million), and the proposed settlement did not appear to have addressed Mr. and Mrs. Fledderman's belief that they were entitled to punitive damages.

Fledderman's anger was further fueled by their observation of Dr. Glunk in the legal proceedings held after Amy's death. From time to time, he has exhibited certain character traits that are sometimes ascribed, stereotypically, to doctors and lawyers: he comes across as arrogant and exceedingly contentious.

For his part, while Dr. Glunk is generally contrite regarding his involvement in Amy's death, at bottom, he believes that he was not at fault and that Amy died due to a rare surgical complication that he could not have foreseen or prevented. He feels victimized by the furor and the litigation that followed her death. Because this medical misadventure happened to have occurred after his surgical skills had been questioned by another doctor (falsely and maliciously, in his view), Dr. Glunk seems to believe that the consequences of this tragedy spiraled out of proportion to any culpability he may have had. As a result of Amy's death, he was subjected to an investigation by the DOH; his existing medical practice was destroyed; he suffered a substantial financial loss that he may only now, ten years later, be recovering from; he felt compelled to file for personal bankruptcy; and he has endured ten (10) years of litigation, in which he has spent countless hours with his lawyers, being examined under oath numerous times by opposing lawyers and attending innumerable court hearings in which his competency and honesty have been questioned repeatedly.

When litigation arising from a tragic event, like this one, migrates to the bankruptcy court, it is frequently transformed. In the alternative universe called "bankruptcy," the issues litigated by the parties may reflect only a part of the reality of the event, as they experienced it. Such is the case here.

The matter before this court is not a medical malpractice case and, by its nature, likely will

not resolve the dispute in a manner that is likely to bring the parties emotional closure. As
presented, the sole, narrow issue is whether Dr. Glunk induced Amy Fledderman to undergo the
elective surgical procedure that resulted in her death by means of false pretenses, a false
representation, or actual fraud under 11 U.S.C. §523(a)(2)(A). Whatever responsibility Dr.
Glunk has for medical malpractice and whatever his interpersonal flaws may be, the only issue
before this court is whether he committed fraud.

As explained below in detail, based on the applicable legal standards, I conclude that Dr.
Glunk did not commit fraud. Therefore, I will enter judgment in Dr. Glunk's favor on the
Plaintiffs' claim under 11 U.S.C. §523(a)(2)(A). Dr. Glunk's debt to the Plaintiffs arising from
Amy Fledderman's death is determined to be a dischargeable debt in this chapter 7 bankruptcy
case.

## II. PROCEDURAL HISTORY

As stated above, the Plaintiffs filed the State Court Action against Dr. Glunk on August
31, 2001[3] and the Debtor filed a chapter 7 bankruptcy case on August 31, 2005. On December 9,
2005, the Plaintiffs, solely in their capacities as administrators of their daughter's estate, initiated
this adversary proceeding to determine the dischargeability of the estate's claims against Dr.
Glunk under §§523(a)(2)(A) and (a)(6) of the Bankruptcy Code, 11 U.S.C. §§523(a)(2) and
(a)(6) ("the Nondischargeability Proceeding"). After granting in part and denying in part Dr.

---

[3]     Subsequently, the Plaintiffs filed a second lawsuit involving the same subject matter. The
second lawsuit was docketed at No. 1942 February Term 2002 (C.P. Phila.). The C.P. Court issued an
order dated August 2, 2002, consolidating the two lawsuits "for all purposes under the caption of the
earliest filed case," i.e., the State Court Action.

Glunk's motions to dismiss the Complaint and, later, the Amended Complaint, I placed the Nondischargeability Proceeding in suspense pending the outcome of the State Court Action. (See Doc. #s 18, 29, 37).[4]

On May 23, 2008, the jury returned a verdict in the State Court Action in favor of the Plaintiffs and against Dr. Glunk in the amount of $3.525 million in compensatory damages and $15.0 million in punitive damages. (Ex. P-A). After denying Dr. Glunk's post-trial motions, the C.P. Court entered judgment in favor of the Plaintiffs and against Dr. Glunk on November 13, 2008. (Ex. P-B). Dr. Glunk then filed an appeal to the Pennsylvania Superior Court in the State Court Action.

Following a status hearing in the Nondischargeability Proceeding held on November 19, 2011, I entered an order removing the Nondischargeability Proceeding from suspense and setting forth a schedule for the submission of summary judgment motions. (See Doc. # 44). The parties timely filed cross motions for summary judgment on December 18, 2008. (Doc. #s 47, 49). Both parties asserted that judgment should be entered in their favor based on certain findings of the jury and the application of the doctrine of collateral estoppel. I denied both summary judgment motions on May 26, 2009. (Doc. # 58).[5]

---

[4]      The order denying the motion to dismiss the Complaint was accompanied by a written opinion. See In re Glunk, 343 B.R. 754 (Bankr. E.D. Pa. 2006). Two other written decisions were issued in the bankruptcy court in 2006. See In re Glunk, 2006 WL 6659552, at *8 (Bankr. E.D. Pa. Aug. 18, 2006) (remanding the State Court Action after Dr. Glunk removed it to this court); In re Glunk, 342 B.R. 717, 736-39 (Bankr. E.D. Pa. 2006) (denying Mr. and Mrs. Fledderman's motion to dismiss "main" bankruptcy case as having been filed in "bad faith").

[5]      While it initially may appear counterintuitive that a $15 million state court judgment for punitive damages does not result in a finding of nondischargeability in a chapter 7 bankruptcy case, I denied the Plaintiffs' motion for summary judgment because the legal prerequisites for the application of
(continued...)

Shortly before trial was scheduled to commence, the Plaintiffs narrowed the triable issues considerably by withdrawing their nondischargeability claim under 11 U.S.C. §523(a)(6). (See Doc. # 94). The Plaintiffs also voluntarily amended their claim seeking to except from discharge only $2,000,000.00 of the debt, exclusive of, and not reduced by, any applicable insurance coverage or by any collateral source, such as payments by other tortfeasors. (See Doc. # 117).[6]

The trial was conducted over eleven non-consecutive days between October 2, 2009 and August 16, 2010.[7] The parties timely filed post-trial submissions, the last of which was filed on December 30, 2010.

---

[5](...continued)
the doctrine of collateral estoppel were not satisfied. My reasoning was set forth in the order denying the cross-motions, which is reported as In re Glunk, 2009 WL 2916975 (Bankr. E.D. Pa. May 26, 2009).

[6]    The Plaintiffs did not explain the reason for the partial withdrawal of their claims against Dr. Glunk in the Nondischargeability Proceeding.

[7]    In this Opinion, I will cite to the notes of testimony from the several dates of trial as follows:

| | | |
|---|---|---|
| October 2, 2009 | - | "1 N.T." |
| October 5, 2009 | - | "2 N.T." |
| November 10, 2009 | - | "3 N.T." |
| November 17, 2009 | - | "4 N.T." |
| November 20, 2009 | - | "5 N.T." |
| January 11, 2010 | - | "6 N.T." |
| March 15, 2010 | - | "7 N.T." |
| April 5, 2010 | - | "8 N.T." |
| May 17, 2010 | - | "9 N.T." |
| June 18, 2010 | - | "10 N.T." |
| July 22, 2010 | - | "11 N.T." |

## III. **FINDINGS OF FACT**

Based on the evidence presented at trial, I make the following findings of fact and conclusions of law as required by Fed. R. Civ. P. 52, made applicable to the Nondischargeability Proceeding by Fed. R. Bankr. P. 7052.[8]

### A. Dr. Glunk's Medical Background and Private Plastic Surgery Practice

1. Dr. Glunk has a medical degree and is board certified plastic surgeon, licensed to practice in the Commonwealth of Pennsylvania. (Jt. Pre-Trial Stmt. ¶1; 5 N.T. at 12, 85-86).

2. In 1985, when Dr. Glunk was in his medical residency, he began performing traditional liposuction on various parts of the body. (6 N.T. at 63-65).

3. Traditional liposuction is another name for a type of liposuction technique called "suction

---

[8]    On November 12, 2010, the Pennsylvania Superior Court issued a decision affirming the C.P. Court judgment in the State Court Action as to Dr. Glunk's liability, but remanding the case for a recalculation of "delay damages" under Pa. R. Civ. P. 238. On the same day, the Plaintiffs filed a copy of the Superior Court's 71-page opinion in this proceeding. (See Doc. # 184).

In their post-trial submissions, the Plaintiffs cite to the Superior Court opinion and treat the court's statement of facts as if they were formal "findings of fact." Respectfully, I cannot accept the recitation of the facts in the Superior Court opinion as state court findings of a fact.

The trial in the C.P. Court was a jury trial. Consequently, there were no formal findings of fact. On appeal from the denial of Dr. Glunk's post-trial motions for judgment notwithstanding the verdict and for a new trial, the Superior Court's role was to consider the facts in the light most favorable to the non-moving party (i.e., the Plaintiffs). See, e.g., Walker v. Drexel Univ., 971 A.2d 521, 523 (Pa. Super. Ct. 2009). There is a difference between considering the evidence in the light most favorable to the jury verdict winner and making actual findings of fact. Without express findings of fact by the trial court factfinder (other than the jury's verdict sheet, which I previously ruled did not support the application of collateral estoppel, Glunk, 2009 WL 2916975, at *2), I have no way of knowing the precise facts found by the jury.

In short, the Pennsylvania Superior Court was not the factfinder in the State Court Action. Consequently, I have based my factual findings solely on the evidence presented in this court.

assisted lipectomy." (4 N.T. at 55).

4.    Suction assisted liposuction involves the removal of fat by use of a cannula with holes that aspirates the fat under suction. It can be done by a machine, syringes, or "anything that applies a vacuum" to the cannula. It can be a very bloody procedure because it is a dry technique whereby the fat is removed without the use of an emulsifying device prior to suction. (4 N.T. at 51-52; 6 N.T. at 61).

5.    In January 1997, after attending multiple seminars, Dr. Glunk was certified in another liposuction technique called "ultrasonic assisted liposuction." By May 2001, Dr. Glunk was using the ultrasonic assisted technique almost exclusively when performing abdominal liposuction procedures. (6 N.T. at 62, 69).

6.    Ultrasonic assisted liposuction, like suction assisted liposuction, also involves the use of a cannula, except it emits ultrasonic waves that break up the fat cells from the connective tissue compartments and emulsify the fat. The fat is then suctioned out without removing the cell membrane. (4 N.T. at 68-69; 6 N.T. at 61).

7.    Traditional liposuction and ultrasonic assisted liposuction are distinct techniques that require separate training and certification. The fundamental difference between them is the manner by which fat cells are broken down to be removed from the body. (4 N.T. at 18; 6 N.T. at 45).

8.    In December 1987, Dr. Glunk joined the staff of the Main Line Health Hospital system ("the MLH System"). (5 N.T. at 180).

9.    At all relevant times, Dr. Glunk maintained staff privileges at Lankeau, Bryn Mawr, Paoli and Mercy-Haverford hospitals, as well as at the Paoli Surgi-Center. (9 N.T. at 119).

10. Dr. Glunk first opened a private office in Wynnewood, Pennsylvania in February 1988. (5

N.T. at 22).

11. When he opened the office, Dr. Glunk named it the "Main Line Plastic Surgery and Laser Associates, Ltd." This occurred before the entity MLH System was formed. (5 N.T. at 15; 22-23).

12. Dr. Glunk's private medical practice was not and has never been associated with the MLH System. (5 N.T. at 23).

13. Dr. Glunk later relocated his private office to King of Prussia, across from the King of Prussia Mall. (5 N.T. at 21, 23).

14. At all relevant times in 1999 and in 2001, Dr. Glunk's facility was an ambulatory surgical facility ("ASF"). (See Order dated Oct. 1, 2009, Doc. # 107).

15. At all relevant times in 1999 and in 2001, Dr. Glunk did not have a license from the Commonwealth of Pennsylvania, DOH for his private office to operate an ASF. (5 N.T. at 15; 1 N.T. at 84, 134).

16. The American Association for Accreditation of Ambulatory Surgery Facilities, Inc. ("the Quad ASF") is a private organization, established in or around 1997 by another private organization, the American Society of Plastic Surgeons, to accredit private medical offices in which plastic surgery is conducted outside of a hospital setting. (5 N.T. at 16).

17. As of May 2001, Dr. Glunk's King of Prussia facility was not certified by the Quad ASF, but an application for certification was pending. (Ex. D-18; 5 N.T. at 16, 20-21).

18. As of May 2001, Dr. Glunk believed his King of Prussia facility was compliant with the Quad ASF guidelines. (6 N.T. at 107).

19. Dr. Glunk's King of Prussia facility was certified by the Quad ASF in either 2002 or 2003.

(5 N.T. at 20-21).

### B. Dr. Glunk's Office Procedures for Surgical Consent Forms

20. As part of Dr. Glunk's private surgical practice, he provided patients with treatment consent forms relating to their respective surgeries in the 1999-2001 time frame. (5 N.T. at 25).

21. Dr. Glunk kept treatment consent forms at his private office for each of the hospitals where he maintained staff privileges because he saw nearly all of his patients at his office. (9 N.T. at 119-20).

22. In lieu of creating his own, personalized consent forms for his private office, Dr. Glunk used consent forms he obtained from the MLH System. (5 N.T. at 25, 29).

23. Dr. Glunk created a sticker with the name of his office – "Main Line Plastic Surgery and Laser Associates, Ltd." – to be placed over the MLH System name and logo on the consent forms. (5 N.T. at 25-26, 33-34, 37).

24. Dr. Glunk relied on an office assistant to help him customize the consent forms for patients he saw at his private facility, but ultimately, it was his responsibility to ensure that they were correct. (5 N.T. at 48).

### C. Dr. Glunk Meets Amy Fledderman and Her Mother Prior to the 1999 Procedure

25. Dr. Glunk first met Amy Fledderman and her mother, Mrs. Fledderman, at his King of Prussia facility in the spring of 1999. (2 N.T. at 15-16; 9 N.T. at 76-77).

26. Amy Fledderman was 17 years old at the time. (2 N.T. at 15).

27. The purpose of the meeting was for Amy Fledderman to consult with Dr. Glunk about plastic

-12-

surgical services for a developmental breast abnormality. (2 N.T. at 15).

28. Dr. Glunk recommended a breast lift and a minor reduction to address the concerns Amy

   Fledderman presented to him. (2 N.T. at 16).

29. Mrs. Fledderman provided consent for Dr. Glunk to perform a bilateral reduction mastoplexy

   on Amy Fledderman. (Ex. P-D; 2 N.T. at 17; 9 N.T. at 78).

30. The MLH System logo was at the top of the consent form provided to Mrs. Fledderman for

   her signature in connection with the procedure and was not covered up by "sticker" that Dr.

   Glunk's staff was supposed to affix over the MLH System logo. (Ex. P-D).

31. That spring, Dr. Glunk performed a bilateral reduction mastoplexty on Amy Fledderman

   ("the 1999 Procedure"). (Id.; 9 N.T. at 78).

32. Edward DeStefano ("Mr. DeStefano"), a nurse anesthetist, administered the anesthesia for

   the 1999 Procedure. (Ex. D-19, DeStefano Dep., Apr. 8, 2003 at 165-66).

33. Dr. Glunk deemed the 1999 Procedure a success without complication. (9 N.T. at 78).

34. Mrs. Fledderman also considered the 1999 Procedure a success because she was unaware of

   any complications that arose during the surgery, including any problems with anesthesia. (2

   N.T. at 21; 27-28).


### D. The Initial "Monitoring" Requirement Imposed in September-October 1999

35. A few months after the 1999 Procedure, Dr. Glunk's surgical skills came under scrutiny by

   doctors in the administrative hierarchy of the MLH System (the "Medical Administrators").[9]

_____

[9]      I use the term "Medical Administrators" to refer to those physicians and other medical
professionals who have administrative authority over other physicians and other medical professionals with
(continued...)

-13-

36. On September 27, 1999, Dr. R. Barrett Noone ("Dr. Noone"), Chief of Plastic Surgery,

    wrote a letter to Dr. Scott Goldman ("Dr. Goldman"), Chairman of the Department of

    Surgery, advising the latter of his impressions from a chart review he conducted pertaining to

    an abdominal suction lipectomy and mini-abdominoplasty performed by Dr. Glunk on

    September 17, 1999. (Ex. P-25A at 266-68).

37. On October 12, 1999, Dr. Noone completed a "Medical Staff Performance Improvement"

    report in connection with the September 17, 1999 surgery performed by Dr. Glunk. The

    form described, inter alia, a bowel injury during abdominal subcutaneous suction lipectomy.

    A checkmark was placed next to "Category III" indicating that:

    > Opportunity for improvement exists: Reflects care that is outside current
    > standards. It is unacceptable by the standards of the department and has at least
    > the potential for adverse effect on the patient.

    (Id. at 265) (emphasis in original).

38. In the section titled "Recommendation/Action" and signed by Dr. Goldman in his capacity as

    "Chair," the Medical Staff Performance stated: "counsel physician, Education, Monitor. (Id.

    (emphasis added)).

39. Contemporaneous with the October 12, 1999 Medical Staff Performance Improvement form,

    Dr. Goldman sent Dr. Glunk a letter advising him that he had reviewed Dr. Noone's

    comments and agreed that opportunity for improvement existed. He also stated that

    "[c]ounseling on the improvement of the technique during abdominal liposection [sic] is

_____

[9](...continued)
respect to the performance of their professional responsibilities in the hospitals. The term is meant to
distinguish medical personnel from non-medical personnel with more general administrative
responsibilities.

-14-

recommended. . . . [W]e will continue to <u>monitor</u> similar cases." (<u>Id.</u> at 264).[10]

40. Notwithstanding common usage of the word "monitor,"[11] the MLH System did not require

Dr. Glunk to have someone observe him in the operating room while conducting surgical

procedures. The use of the word "monitor" in the October 12, 1999 Medical Staff

Performance Improvement form was simply a notation memorializing the MLH System's

intention to "keep an eye" on Dr. Glunk. (8 N.T. at 131-32). In addition, Dr. Goldman

expected that Dr. Noone would provide some "counseling" to Dr. Glunk. (<u>Id.</u> at 50).

41. Notwithstanding the imposition of this "monitoring" requirement, no "monitoring" or

"counseling" of Dr. Glunk occurred in the months immediately after October 2000.[12]


### E.  The Modified "Monitoring" Requirement Imposed in May 2000

42. In May 2000, the Medical Administrators of the MLH System modified the terms of the

"monitoring" requirement imposed on Dr. Glunk in the fall of 1999.

---

[10]     Dr. Glunk responded to Dr. Goldman in a letter dated October 28, 1999.  In his letter, Dr. Glunk disputed Dr. Noone's observations, stated the review was "entirely incompetent," and requested that it be removed from his permanent record.  Dr. Glunk expressed his belief that Dr. Noone had some "personal agenda" and was targeting Dr. Glunk to damage his professional reputation.  (Ex. P-25A at 262-63).

[11]     The New Oxford American Dictionary (2010) defines the verb "monitor" as meaning to "observe and check the progress or quality of (something) over a period of time; keep under systematic review."

[12]     Dr. Goldman testified that he believed that "counseling" had occurred.  (8 N.T. at 50).  Dr. Glunk denied that he received any counseling after October 1999.  (6 N.T. at 110).  In light of Dr. Glunk's antipathy toward Dr. Noone and Dr. Goldman's somewhat hazy memory of some of the details of his medical oversight of Dr. Glunk, I credit Dr. Glunk's testimony over Dr. Goldman's testimony on this particular point.

-15-

43.  Dr. Goldman wrote a letter to Dr. Glunk dated May 15, 2000 ("the May 15, 2000 Letter") in

which he described "concerns" he had with a complication Dr. Glunk "experienced during

suction . . . assisted abdominal lipectomy procedure." (Ex. P-25A at 237).

44.  It is unclear whether the May 15, 2000 Letter referenced the incident in 1999 that led to Dr.

Noone's letter of September 27, 1999, or a new incident.[13]

45.  In the May 15, 2000 Letter, Dr. Goldman memorialized an understanding he had reached

with Dr. Glunk about how to resolve Dr. Goldman's "concerns:"

> [W]e have discussed and you have agreed to conduct *__suction assisted__*
> *__abdominal lipectomy__* procedures **in the presence of a monitor**.  **The**
> **monitoring requirement is intended as a collegial educational effort** to
> address my concerns and questions related to your complications during *__suction__*
> *__assisted__* **abdominal lipectomy procedures**.  At all times, during *__suction__*
> *__assisted__* **abdominal lipectomy procedures**, you must have an approved
> monitor work with you during **these surgical cases**.  Any active member of the
> Main Line Health Division of Plastic Surgery can serve in the capacity of a
> monitor.  It will be your responsibility to schedule the monitor.  In addition, it
> will be your responsibility to review the case, in advance or at the time of
> scheduling the case, with the monitor.  The monitor will perform an evaluation
> on each proctored case.  The monitoring requirement will remain in effect for
> approximately 10 proctored cases, at which time I will review the evaluations of
> the monitored cases.

(Id. (emphasis added)).

46.  The monitoring requirement imposed on Dr. Glunk by the May 15, 2000 Letter was only for

abdominal lipectomies employing the "suction assisted" liposuction technique, and was not

---

[13]      Dr. Goldman testified that the reason for the proctoring requirement set forth in the May
15, 2000 Letter was a concern arising from two instances during an abdominal liposuction that were
brought to his attention; both of which involved the abdominal wall fasia being punctured or abraded.  (8
N.T. at 31-33; 39-40).  Dr. Glunk contended that the monitoring requirement was a result of only one
instance.  (9 N.T. at 69; 10 N.T. at 20-21).  It is unnecessary for me to resolve this issue of fact.

-16-

for procedures employing "ultrasonic assisted" techniques.  (emphasis added).[14]

47. Dr. Glunk did not believe the monitoring requirement was justified, but claimed that he

agreed to it out of respect for Dr. Goldman.  (10 N.T. at 62).

### F.  Dr. Glunk's Surgical Privilege Reappointment Request in August 2000

48. Approximately two (2) months later, on or around August 1, 2000, Dr. Glunk completed a

form to request his surgical privileges as part of his regular reappointment process with Main

Line Health Hospitals' Department of Surgery/Division of Plastic Surgery ("the 2000

Delineation of Privileges Form").  (See Ex. P-W).

49. Dr. Glunk requested nearly all of the listed surgical privileges on the 2000 Delineation of

Privileges Form.  In particular Dr. Glunk requested Item No. 52, "Suction assisted

lipectomy," and Item No. 52A, "Ultrasonic assisted lipoplasty."  (Id.).

50. After Dr. Glunk submitted his request, the form was sent to Drs. Noone and Goldman for

separate approvals.  Both Drs. Noone and Goldman "recommended" Dr. Glunk for Items 52

and 52A.  However, in late December 2000,  Dr. Goldman placed a checkmark in the column

titled "Limitations," next to Item 52, "Suction assisted lipectomy."  (Id.; 8 N.T. at 33-34,

139-140).  By December 25, 2000, Dr. Glunk, Dr. Goldman, and Dr. Noone had signed Dr.

Glunk's 2000 Delineations of Privileges Form.  (Ex. P-W).

51. In the interim, on October 25, 2000, Dr. Noone completed and signed another form known

as Dr. Glunk's "Reappointment Profile."  It indicated that the term of Dr. Glunk's

---

[14]      This was a major factual issue at trial.  This finding is discussed further in Part IV.B.1.a.,
infra.

reappointment to the hospital staff was for <u>one</u> year only.  Also, the characterization "Needs

improvement" was checked off under the heading "Clinical judgment and technical skills

reflect current competence."  There was a supplemental notation that stated that Dr. Glunk

"needs supervision on abdominal liposuction."  The Reappointment Profile was signed by

Drs. Goldman and Noone.  (Ex. P-25A at 229; 8 N.T. at 134-35).

52. Dr. Glunk was **not** sent a copy of the Reappointment Profile.  (8 N.T. at 140).


### G.  <u>Dr. Glunk's Re-Appointment to the MLH Medical Staff in 2001</u>

53. In a letter dated January 5, 2001, Dr. Glunk was advised  that his reappointment to the Main

Line Health Hospitals' Medical Staff was for <u>one year only</u>, expiring on January 5, 2002.

(Ex. P-25A at 228).

54. In response, Dr. Glunk sent Dr. Goldman a letter dated January 23, 2001.  In his letter, Dr.

Glunk described a conversation they had regarding the "peer review" protection afforded to

the monitoring requirement and claimed that Dr. Goldman had "guaranteed it would never be

present on any non-peer review related document."  In the letter, Dr. Glunk also stated Dr.

Noone was personally harassing him and requested that his appointment and privileges be

"correct[ed]."  (<u>Id.</u> at 227).

55. Dr. Goldman reconsidered Dr. Glunk's reappointment term.  He sent a memo dated February

13, 2001 in which he stated that upon Dr. Glunk's request, he had reconsidered his one-year

reappointment recommendation and was now recommending that Dr. Glunk be reappointed

for a two-year term, expiring on January 5, 2003.  (<u>Id.</u> at 226; 8 N.T. at 57-58, 130).

56. Notwithstanding Dr. Goldman's memo dated February 13, 2001, the checkmark indicating a

-18-

"Limitation" for Item 52, "Suction assisted lipectomy," on Dr. Glunk's Delineation of

Privileges Form was never removed at any time after Dr. Glunk's reappointment was revised

to a two year term. (8 N.T. at 78, 85).


### H. Amy Fledderman's 2001 Procedure

#### 1. the May 15, 2001 Consultation

57.  In the spring of 2001, Amy Fledderman was an 18-year-old college student attending Penn

State University.  She was an athlete and led a healthy lifestyle. (2 N.T. at 31, 110; 9 N.T. at

17).

58.  However, at this time, even though she had lost 25-30 pounds, Amy Fledderman complained

that she was unable to lose additional fat, despite her best efforts through diet and exercise.

(2 N.T. at 28-29).

59.  In connection with her concerns described above, Amy Fledderman called Dr. Glunk to

inquire into having liposuction and to schedule an appointment for a consultation. (2 N.T. at

30; 10 N.T. at 36-40).

60.  Amy consulted with Dr. Glunk at his office on May 15, 2001 ("the May 15, 2001

Consultation"). (2 N.T. at 30-31; 5 N.T. at 105-106, 134; 6 N.T. at 131).

61.  Mrs. Fledderman accompanied her daughter to Dr. Glunk's office and was present for the

entire duration of the May 15, 2001 Consultation. (2 N.T. at 34; 5 N.T. at 107-08).

62.  Mrs. Fledderman is a college graduate.  She received a B.A. in Elementary Education and

Early Childhood Education in 1975 and obtained a certification as a reading specialist in

1986.  Except for some time away from the workplace while raising her family, she has

taught regularly at the middle school (in both public and private schools) and the junior

college and college levels. (2 N.T. at 10-12).

63. The May 15, 2001 Consultation lasted approximately 45 minutes. (5 N.T. at 134).

64. Dr. Glunk recommended two different types of liposuction to address Amy Fledderman's

concerns: traditional liposuction and ultrasonic liposuction. (2 N.T. at 36).

65. During the May 15, 2011 Consultation, Mrs. Fledderman asked Dr. Glunk several questions

about the risks of the procedures, including about blood clots and blood loss. (2 N.T. at 39-

40).

66. Mrs. Fledderman specifically asked whether death was a risk and if any one had ever died

during any procedure Dr. Glunk had performed. (9 N.T. at 29-30).

67. Dr. Glunk advised that only one patient had died, but explained that the patient was a

prescription drug abuser whose death resulted from an improper mixture of painkillers and

prescription medication after the procedure. (2 N.T. at 39-40; 9 N.T. at 29-30).

68. Dr. Glunk also represented to Amy and Mrs. Fledderman that the procedure was safe,

particularly because Amy was a young, healthy athlete and in excellent physical condition. (2

N.T. at 37-40).

69. Also, Dr. Glunk referred to a Quad ASF study that concluded that accredited Quad ASF

facilities were essentially as safe as a hospital or a surgery center. (5 N.T. at 70-71, 6 N.T. at

80, 106-07; 9 N.T. at 81, 116-17; 10 N.T. at 7).

70. Dr. Glunk did not disclose that his private office was not certified by the Quad ASF. (10

N.T. at 8)

71. Dr. Glunk did not mention the monitoring requirement then in effect at the MLH System

hospitals.  (6 N.T. at 74, 124).

72.  Dr. Glunk presented Amy Fledderman with a treatment consent form for her signature during

the May 15, 2001 Consultation ("the 2001 Consent Form").  (Ex. P-E).

73.  The 2001 Consent Form did not have Dr. Glunk's personalized sticker affixed to it.  Rather, it

displayed the MLH System logo at the top.  (Ex. P-E; 2 N.T. at 51-52; 5 N.T. at 30-31).

74.  Dr. Glunk also discussed anesthesia during the May 15, 2001 Consultation.  He represented

that Amy Fledderman would have "monitored anesthesia care" ("MAC"), and that she would

be "lightly out," and would not be "completely under" general anesthesia.  (Ex. P-F; 2 N.T.

at 58, 9 N.T. at 139).[15]

75.  Dr. Glunk offered Amy the choice between having the anesthesia administered by a physician

(i.e., an anesthesiologist) and a certified registered nurse anesthetist ("CRNA").  (9 N.T. at

80-83).

## 2.  after the May 15, 2001 Consultation

76.  Following the May 15, 2001 Consultation, Dr. Glunk dictated notes of his meeting with the

Mrs. Fledderman and her daughter. The notes stated:

> Pt here with questions about UAL of chin, abdomen, and flanks.  Pt had risks and
> benefits including risks of injury to surrounding structures, unknown risks, residual
> deformity, loss of skin, facial nerve weakness or paralysis. PE is unremarkable
> without hernias.  Pt was quoted a total price of $5000.00.  Pt will follow up.

---

[15]    When MAC is used, the patient is breathing on his/her own and is easily arousable, such
that, if the medication for sedation is not longer administered, the patient will quickly arouse. (3 N.T. at
56-57).  In the majority of MAC cases, healthcare providers can continue to have a conversation with the
patient. (3 N.T. at 127).  However, when a patient is under general anesthesia, they are unconscious. (3
N.T. at 57).

(Ex. P-C at 10719; 5 N.T. at 134-36).

77. Mrs. Fledderman played a decision-making role in her daughter's 2001 surgical procedure with Dr. Glunk. (2 N.T. at 31, 42-43).

78. Prior to Amy's scheduled surgery on May 23, 2001, Mrs. Fledderman sent two checks made personally payable to Dr. Glunk. (Ex. P-9). Mrs. Fledderman wrote those checks with the expectation that her daughter would pay the money back. (2 N.T. at 68-70).

### 3.  the 2001 Procedure on May 23, 2001

79. On May 23, 2001, the day of the 2001 Procedure, Mrs. Fledderman accompanied her daughter to Dr. Glunk's office. (2 N.T. at 72-73).

80. On that day, either Dr. Glunk or another medical professinal presented Amy Fledderman with a consent form for anesthesia for her signature ("the 2001 Anesthesia Consent Form"). (Ex. P-F).

81. Dr. Glunk again represented his intent for Amy Fledderman to receive MAC anesthesia. (9 N.T. at 139).

82. Amy and Mrs. Fledderman also met with Mr. DeStefano before the operation to discuss the anesthesia for the 2001 Procedure. (2 N.T. at 77-80; 9 N.T. at 41).

83. Mr. DeStefano is the same CRNA who provided anesthetic services for Amy Fledderman during the 1999 Procedure.

84. The 2001 Procedure consisted of the following: ultrasonic-assisted liposuction of the abdomen and flanks and traditional liposuction of the submental (neck) region. (5 N.T. at 12-13).

85. At some time after completion of the surgical procedures, Dr. Glunk came out to the waiting

room and advised Mrs. Fledderman that they were having problems awakening Amy. At that

point, Mrs. Fledderman requested that Amy be transferred to a hospital. (2 N.T. at 60; 9

N.T. 43-45).

86. Dr. Glunk went back into the operating room, but returned a few minutes later and advised

Mrs. Fledderman that there was nothing to be concerned about because he had just been

advised that Amy had a "rough emergence" from the anesthesia she received during the 1999

Procedure, and that she would be fine. (2 N.T. at 60).

87. This was the first time Mrs. Fledderman heard the term "rough emergence" from Dr. Glunk.

(2 N.T. at 61).

88. Later, Amy Fledderman was transferred to a local hospital.

89. On May 25, 2001, Amy Fledderman died as a result of a complication from the 2001

Procedure.[16]


I. **Events Following the 2001 Procedure**

90. By letter dated June 22, 2001, approximately one month after Amy Fledderman's death, Dr.

Glunk's privileges within the MLH System were renewed for a two-year period, expiring on

June 21, 2003. (See Ex. P-25A at 225).

---

[16]    The record lacks testimonial or evidentiary support regarding the precise details of Amy
Fledderman's post-operative complications and treatment and ultimate cause of her death. Those facts
were not material factual issues in this proceeding. However, through representations made by counsel
during the course of the proceeding, it is undisputed that on the day of the 2001 Procedure, Amy
Fledderman was transferred post-operatively from Dr. Glunk's private facility to a hospital and that she
died two (2) days later as a result of complications, which included "fat embolism syndrome." Findings of
Fact No. 88 and 89 are included to provide context to the factual narrative set forth above.

91. In a letter dated August 31, 2001 ("the August 13, 2001 Letter"), nearly two months after

Amy Fledderman's death, Dr. Goldman confirmed a discussion he had with Dr. Glunk during

a meeting on July 25, 2001.  With reference to the monitoring requirement described in the

May 15, 2000 Letter and in place since May, 2000, Dr. Goldman stated in his letter:

> The mandatory proctoring requirement for **any abdominal liposuction**
> **cases** performed by you in any of the MLH System facilities, in effect since
> May 15, 2000, remains in effect as noted in my recommendation for your
> June 21, 2001 reappointment.  You indicated that you had not performed
> any abdominal liposuction cases since I imposed the proctoring
> requirement and did not intend to do any cases in the future.  You also
> indicated that you would not reapply for abdominal liposuction privileges
> at your next staff reappointment.

(Ex. P-X1) (emphasis added).

92. Also in August of 2001, the Pennsylvania Department of Health ("the DOH") initiated an

investigation into Dr. Glunk's facility based upon a complaint in connection with the 2001

Procedure and Amy Fledderman's death.  (Ex. P-12; 1 N.T. at 74-75).

93. In accordance with its investigation, the DOH requested that Dr. Glunk produce records of

patients who had "undergone surgical procedures in the operating room [of Dr. Glunk's

private office] in calendar year 2001."  (Ex. P-12 at 4784).

94. Dr. Glunk made thirty-eight (38) patient records available to the DOH.  (Id. at 4785; 1.N.T.

at 86, 90).

95. Among those 38 records, the DOH found 38 forms with the MLH System letterhead and

logo that Dr. Glunk improperly used for patients who had procedures at his office.  (Ex. P-12

at 4784-85; 1 N.T. at 86-90).

## IV. DISCUSSION

### A. Dischargeability under 523(a)(2)(A)

One of the Bankruptcy Code's fundamental purposes is to permit honest debtors to

reorder their financial affairs with their creditors and obtain a "fresh start," free from the weight of

oppressive, preexisting debt. See, e.g., In re Cohn, 54 F.3d 1108, 1113 (3d Cir. 1995).

Consequently, courts construe exceptions to discharge narrowly and strictly. E.g., id.; In re

Sandoval, 541 F.3d 997, 1001 (10th Cir. 2008); In re Antonius, 358 B.R. 172, 181 (Bankr. E.D.

Pa. 2006).[17]

Section 523(a)(2)(A) excepts from discharge a debt "for money, property, services, or an

extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false

representation, or actual fraud, other than a statement respecting the debtor's . . . financial

condition . . . ." 11 U.S.C. §523(a)(2)(A).

To prevail on a complaint brought under §523(a)(2)(A), a creditor bears the burden of

proving the following elements by a preponderance of the evidence:

1. the debtor made a material representation of fact that he knew at the time was false or contrary to his true intentions;

2. the debtor made the representation with the intent and purpose of deceiving the creditor;[18]

---

[17]     As stated earlier, the Plaintiffs' complaint stated causes of action under 11 U.S.C. §§523(a)(2)(A) and 523(a)(6). The Plaintiffs voluntarily dismissed the § 523(a)(6) claim prior to trial. Therefore, my discussion is limited the Plaintiffs' claim under §523(a)(2)(A).

[18]     In Field v. Mans, 516 U.S. 59, 68 (1995), the Supreme Court stated that "common sense would balk" at any reading of §523(a)(2)(A) that did not require intentional misrepresentation. Id.; see also In re Bruce, 262 B.R. 632, 636 (Bankr. W.D. Pa. 2001). The Court held that "false pretenses, a false representation, or actual fraud" are "terms of art" that have "accumulated settled meaning under . . . the
(continued...)

-25-

      3. the creditor justifiably relied on the such representation; and

      4. the creditor suffered a loss or damages as a proximate cause of the false
          representation or act.

See, e.g., In re Kishbaugh, 399 B.R. 419, 425 (Bankr. M.D. Pa. 2009); Antonious, 358 B.R. at

182; Glunk, 343 B.R. at 759.

     A creditor may also succeed in establishing that a debt is nondischargeable under

§523(a)(2)(A) by proving that the debtor failed to disclose a material fact. "Deceit, deliberate

nondisclosure, or the omission of material facts [may] render[] a debtor as culpable as does an

intentional false affirmation." In re George, 1991 WL 208818, at *5 (Bankr. W.D. Pa. Oct. 8,

1991); see also In re Docteroff, 133 F.3d 210, 216 (3d Cir. 1997) (a finding of fraud for purposes

of §523(a)(2)(A) may be predicated on debtor's failure to disclose material fact).

     The Plaintiffs assert that, in connection with Amy Fledderman's 2001 Procedure, Dr.

Glunk made several fraudulent misrepresentations upon which Mrs. Fledderman relied when

advising her daughter to go forward with the surgery and upon which Amy relied upon in making

her decision to undergo the surgical procedure. The Plaintiffs also assert that Dr. Glunk

fraudulently omitted material facts, which misled Amy into consenting to the surgical procedure

that led to her death.

     I will discuss each alleged misrepresentation or omission separately.

---

(...continued)
common law." Field, 616 U.S. at 69 (internal citations omitted). This settled meaning clearly includes an
intent to deceive.

### B. The Alleged Fraudulent Misrepresentations

#### 1. Did Dr. Glunk misrepresent that his private facility was as safe as a hospital?

The Plaintiffs contend that Dr. Glunk misrepresented that it was as safe to perform the 2001 Procedure in his private office as in a hospital. They support their position with three arguments.

First, they claim that Dr. Glunk deliberately failed to disclose a limitation that the hospital had placed on his surgical privileges when he discussed the comparative risks of office-based versus hospital surgery with Amy Fledderman and Mrs. Fledderman prior to the 2001 Procedure.

Second, the Plaintiffs argue that Dr. Glunk's reference to the Quad ASF study was a fraudulent misrepresentation intended to induce Amy Fledderman into believing that his office was just as safe as a hospital.

Finally, the Plaintiffs contend that Dr. Glunk manifested the requisite intent to defraud Amy because he performed procedures at his unlicensed facility that would have been impermissible, even if he had a license to operate an ASF.

#### a. Dr. Glunk's Hospital Privileges

#### (1)

The existence or non-existence of limitations on Dr. Glunk's hospital privileges was the most vigorously litigated issue in this case. The parties disagreed as to whether a limitation existed, the contours of any limitation that may have existed and whether Dr. Glunk had a duty to disclose the existence of the limitation during consultations with his patients prior to obtaining their consent for surgery in his private facility.

-27-

The Plaintiffs contend that, as of May 2000 and continuing until and after the 2001

Procedure:

- the MLH System imposed a "monitoring requirement" on Dr. Glunk for all abdominal liposuction procedures performed at the MLH facilities that limited him from performing any abdominal liposuction procedure in a MLH System hospital without the presence of another surgeon in the operation room, who was required to proctor or monitor him during the procedure, (Pls.' Proposed Findings at ¶¶24, 26);

- this monitoring requirement was in effect at the time of the 2001 Procedure;

- Dr. Glunk was aware of this monitoring requirement;

- Dr. Glunk's failure to disclose this limitation was a material misrepresentation about the safety of his private office, in that he failed to disclose to Amy Fledderman that he was proposing to perform a procedure in his office – unassisted and unmonitored – whereas the same procedure required the presence of a monitor if performed in one of the MLH System hospitals; and

- had Mrs. Fledderman known about Dr. Glunk's limited hospital surgical privileges (or more generally, that a hospital was a safer location than Dr. Glunk's private facility), Mrs. Fledderman would have recommended to Amy that the procedure be performed in a hospital, and would not have loaned the money to Amy if she had not followed that recommendation. (2 N.T. at 179-80).

Dr. Glunk acknowledges that he did not discuss the monitoring requirement with the

Fleddermans prior to the 2001 Procedure, but offers four rationales for his silence on the subject

during the May 15, 2001 Consultation.

First, he contends that the checkmark indicating a limitation on the Delineation of

Privileges form was simply a mistake and no limitation existed as of May 2001.[19]

---

[19]     Contrary to Dr. Glunk's position, I have found that there was a monitoring requirement in place for suction assisted liposuction procedures in May 2001. However, Dr. Glunk's contention is not made out of whole cloth; it finds at least some support in the record.

    In 2000, Dr. Goldman initially reappointed Dr. Glunk for only a one-year term, instead of
(continued...)

Second, he believed that the asserted limitation on his surgical privileges is more

accurately characterized as a peer review protected collegial intervention, not a limitation, and

that he was not required under any law to reveal peer review protected information to a patient

(5 N.T. at 166; 6 N.T. at 102-05, 109, 132).[20] Dr. Glunk testified that he always understood that

---

[19](...continued)
the standard two-year re-appointment term. (Ex. P-25A at 228). Upon receiving this news, Dr. Glunk
protested this decision in a letter to Dr. Goldman in which he asserted that Dr. Goldman had assured him
that the monitoring requirement "would never be present on any non-peer review related document" and
that Dr. Noone was personally harassing him. Dr. Glunk also requested that his appointment and
privileges be "correct[ed]." (Id. at 227). Less than one month later, Dr. Goldman sent a memo dated
February 13, 2001 in which he stated that upon Dr. Glunk's request, he had reconsidered his prior
recommendation and was now recommending that Dr. Glunk be reappointed for a two-year term. (Id. at
226). Dr. Goldman testified that he reconsidered because Dr. Glunk was being cooperative and that the
monitoring requirement was only for a single procedure. (8 N.T. at 57-58, 130).

From Dr. Glunk's perspective, Dr. Goldman's February 13, 2001 memo favorably
resolved the dispute regarding the limitations on his surgical privileges. (6 N.T. at 120-21), in particular,
the problems Dr. Glunk had with the limitations checkmark on the 2000 Delineation of Privileges Form. (5
N.T. at 190, 6 N.T. at 56, 10 N.T. at 11). Dr. Glunk may have interpreted Dr. Goldman's
recommendation that he receive a two-year appointment as confirmation that the checkmark was incorrect
because he believed that the checkmark was a mistake and understood that a doctor with "limitations" on
his or her privileges cannot be granted a two year reappointment. (10 N.T. at 10-11).

Finally, I note that Dr. Glunk presented a memorandum dated October 7, 2002 from Anne
Elliot to Dr. Goldman. (Ex. D-1). Dr. Glunk contends that this memo clarified that the limitation
checkmark should never have been there because the memo stated that "remedial collegial interventions –
such as proctoring and monitoring requirements – are not 'restrictions' on the physician's ability to
practice." (Id.). I have not relied on this evidence in reaching my decision. To the extent that the October
2002 Elliot-Goldman memo reassured Dr. Glunk that the checkmark was erroneous and/or did not restrict
his hospital surgical privileges in any way (such that he did not have a responsibility to disclose it to a
patient at his private facility), it was after-the-fact and could not have affected his state of mind in May
2001.

[20]      Dr. Glunk also suggested that disclosure would "waive[] the peer review privilege" –
something he claims he is not required to do. (6 N.T. at 105). Dr. Glunk was referring to the Pennsylvania
Peer Review Protection Act ("the PRPA"), 63 P.S. §§425.1-425.4, a statute that creates an evidentiary
privilege in civil actions in Pennsylvania. The PRPA provides, in relevant part:

The proceedings and records of a review committee shall be held in confidence and shall
not be subject to discovery or introduction into evidence in any civil action against a
(continued...)

the terms "monitoring" and "proctoring" were used interchangeably and that they were distinct

from "limitations" or "restrictions." (5 N.T. at 157-58, 175-77; 6 N.T. at 17). He claimed that if

he had decided to do a traditional abdominal liposuction procedure at a MLH System hospital

prior to May 2001, he had options for fulfilling the monitoring requirement: he either could go

watch another surgeon perform the procedure; or he could have someone discuss the case ahead

of time and then perform the surgery with the other surgeon present in another room. (6 N.T. at

18-19). Under either alternative, he asserted that there was no restriction because he could

schedule the surgery and perform it without another surgeon watching him in the operating

room.[21]

---

[20](...continued)

> professional health care provider arising out of the matters which are the subject of
> evaluation and review by such committee and no person who was in attendance at a
> meeting of such committee shall be permitted or required to testify in any such civil action
> as to any evidence or other matters produced or presented during the proceedings of such
> committee or as to any findings, recommendations, evaluations, opinions or other actions
> of such committee or any members thereof: Provided, however, That information,
> documents or records otherwise available from original sources are not to be construed as
> immune from discovery or use in any such civil action merely because they were presented
> during proceedings of such committee, nor should any person who testifies before such
> committee or who is a member of such committee be prevented from testifying as to
> matters within his knowledge, but the said witness cannot be asked about his testimony
> before such a committee or opinions formed by him as a result of said committee hearings.

63 P.S. §425.4 (emphasis added). In Young v. W. Pennsylvania Hosp., 722 A.2d 153, 156 (Pa. Super.
Ct. 1998)), the court stated: "Documents used in the determination of staff privileges are exactly the type of
documents the legislature contemplated when drafting the Peer Review Protection Act."

　　　　　Dr. Glunk appears to assume that if peer review material is protected from disclosure in a
civil action, it follows that a physician need not disclose the same information to a patient in obtaining the
patient's informed consent prior to performing a medical procedure. I do not decide whether Dr. Glunk's
assumption is correct.

[21]　　　　Dr. Goldman believed that if Dr. Glunk wanted to schedule a traditional suction
liposuction procedure of the abdomen, pursuant to Item 52 on the Delineation of Privileges Form, the
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　(continued...)

-30-

Third, he believed that the DOH permitted him to perform procedures in his private facility irrespective of the state of his privileges at the hospital and that he therefore had no duty to discuss his MLH System surgical privileges with the Fleddermans. (6 N.T. at 82; 102; 109-10).[22]

Fourth, he believed that even if the monitoring requirement was some type of "limitation," and even if disclosure of such a limitation was appropriate, the MLH System limitation on his surgical privileges was only for (and he believed that it was only for) traditional abdominal lipectomies,[23] whereas he performed a different liposuction procedure on Amy Fledderman: "ultrasonic liposuction." According to Dr. Glunk, no disclosure to Amy Fledderman of the purported limitation on his hospital surgical privileges was required in May 2001 because he was not proposing to perform traditional abdominal liposuction on her. (5 N.T. at 97; 6 N.T. at 97-98, 132).

─────────────────

[21](...continued)
hospital staff member reserving the operating room would have been prompted with a reminder that Dr. Glunk required a monitor or proctor to conduct the procedure and would have not scheduled the procedure until that requirement was satisfied. (N.T. at 8 at 142-143). His testimony can be harmonized with Dr. Glunk's testimony described above in the text.

[22]    He testified that he believed that it is not a Quad ASF certification requirement that a physician have hospital privileges to perform a procedure in his or her own surgical center. (6 N.T. at 82). I gave no weight to this particular rationale. Dr. Glunk testified that the Quad ASF position on this subject was expressed in a "memo" that came "out sometime in the last two or three years that they no longer, [although] they used to require that you had privileges at a hospital [that was] Quad ASF certified." (6 N.T. at 82). Dr. Glunk's own testimony suggests that, in 2001, the requirement for certification was eliminated years after the 2001 Procedure.

[23]    Dr. Glunk testified unequivocally: "My belief at all relevant times was that the only thing that the monitoring requirement ever had anything to do with was traditional abdominal liposuction." (9 N.T. at 70; see also 5 N.T. at 178).

-31-

In Parts IV.B.1.a.(2), (3) and (4), below I explain why I have resolved the material factual issues with respect to Dr. Glunk's surgical privileges in his favor.

**(2)**

The evidentiary record supports the finding that, upon his receipt of the May 15, 2000 Letter, Dr. Glunk was aware that the MLH System was imposing a more formal "monitoring" requirement than that initially imposed in the fall of 1999. See Findings of Fact Nos. 35-47. However, the contemporaneously prepared MLH System records memorializing the monitoring requirement do not support a finding that the Medical Administrators imposed a monitoring requirement on Dr. Glunk for all abdominal liposuction procedures. Unequivocally, the May 15, 2000 Letter refers only to "suction assisted abdominal lipectomy procedures." See Findings of Fact Nos. 45-46.

In any event, regardless of the Medical Administrators' subjective intent, the evidence shows that they failed to clearly advise Dr. Glunk that he was subject to a broader limitation on his surgical privileges.

On its face, the May 15, 2000 Letter refers only to traditional liposuction and does not reference ultrasonic assisted liposuction. The May 15, 2000 Letter states four (4) times that the monitoring requirement was intended for "suction assisted abdominal lipectomy procedures." (Ex. P-25A at 237) (emphasis added). I find it perfectly reasonable that Dr. Glunk read those words in pari materia with the 2000 Delineation of Privileges Form, which distinguishes between suction assisted and ultrasonic liposuction procedures, treating them as separate "privileges."

-32-

Thus, the text of the May 15, 2000 Letter fully supports Dr. Glunk's testimony that in May 2001, when he consulted with Amy Fledderman, he understood that the limitation applied to traditional abdominal liposuction and not to ultrasonic assisted abdominal liposuction procedures. The fact that the only limitation check mark on the 2000 Delineation of Privileges Form was for "suction assisted lipectomy" and that no limitation checkmark was made for the ultrasonic procedure,[24] further supports this finding regarding Dr. Glunk's state of mind.[25]

This is a fraud case, not a negligence case. Proof of Dr. Glunk's fraudulent state of mind is an essential element of the Plaintiffs' cause of action. It is dispositive that Dr. Glunk did not understand that the limitation encompassed all liposuction techniques in the abdomen prior to the May 15, 2001 Consultation.

**(3)**

To support their contention that I should make a contrary finding, the Plaintiffs rely on the August 13, 2001 Letter. I have carefully reviewed this document and conclude that it lacks substantial probative value.

In the August 13, 2001 Letter, sent to Dr. Glunk less than two months after Amy's death, Dr. Goldman stated:

---

[24]     See Exs. P-W, D-W1; 4 N.T. at 104-08. Dr. Goldman acknowledged that he never placed a checkmark next to Item 52A, ultrasonic assisted lipoplasty, and that Dr. Noone never recommended that he do so. (8 N.T. at 139-140).

[25]     I am aware that Dr. Glunk also proposed to perform some suction assisted liposuction on Amy Fledderman. However, he performed traditional liposuction only on Amy's sub-mental region, not her abdomen, which was the only bodily area subject to the limitations stated in the communications Dr. Glunk received from the MLH Administrators.

-33-

> The mandatory proctoring requirement for **any abdominal liposuction cases**
> performed by you in any of the MLH System facilities, **in effect since May 15, 2000**,
> remains in effect as noted in my recommendation for your June 21, 2001
> reappointment.

(Ex. P-25A at 218) (emphasis added).

It is most striking that the August 13, 2001 Letter refers to "any abdominal liposuction"

cases whereas: (1) the May 15, 2000 Letter stated (four times) that the monitoring requirement

was intended for "suction assisted abdominal lipectomy procedures," and (2) the Delineation of

Privileges form, which distinguishes between suction assisted and ultrasonic liposuction

procedures, imposed a limitation only on the former.  When the August 13, 2001 Letter is

compared to those earlier documents, its description of the monitoring requirement suggests a

broadening of the MLH Medical Administrators' oversight of Dr. Glunk, not a description of the

existing monitoring requirement.  The language in the August 13, 2001 Letter – a letter drafted

after Amy Fledderman's shocking death and suggesting that a monitoring requirement for all

abdominal liposuction procedures had been in place since the May 15, 2000 – has the

appearance of being a factually inaccurate, self-serving effort by the MLH Administrators to

shield the MLH System from potential liability.

Had the MLH System always intended the monitoring requirement to cover both

traditional and ultrasonic liposuction procedures, I believe that the contemporaneously prepared

paper trail would have described the broad scope of the monitoring requirement unambiguously

by referring to all abdominal liposuction procedures and not to suction assisted procedures.  To

conclude otherwise and rule for the Plaintiffs on this issue, I would have to find that: (1)  the

MLH Administrators were unable to express themselves in plain English in defining the scope of

the monitoring requirement and (2) Dr. Glunk was able to glean their broader scope of the

-34-

requirement from some source other than the plain meaning of the words on the pages of their communications to him.[26] I decline to do so.

Nor was Dr. Goldman's testimony on the subject convincing. Dr. Goldman stated, "our concern was basically the abdominal procedure, not the particular instrument as far as I was concerned." (8 N.T. at 98). Yet, he acknowledged that he did not memorialize in any documents that the requirement for Dr. Glunk was for anything other than for "suction assisted abdominal lipectomy procedures." (Id. at 116). To the extent that Dr. Goldman was suggesting that the monitoring requirement imposed on Dr. Glunk via the May 15, 2000 Letter encompassed all abdominal liposuction procedures, I do not credit his testimony, due both to the conflict between his testimony and the documentary record, as well as the uncertain memory of the events that he displayed during his testimony.

(4)

To sum up my finding on this factual issue, based largely on the May 15, 2001 Letter, I find that:

> (1) the distinction drawn by Dr. Glunk between the MLH System's limitation on his "traditional liposuction" and "ultrasonic liposuction" surgical privileges is

---

[26]     The one document that lends the most support to the Plaintiffs' position that Dr. Glunk had a broader monitoring requirement prior to the 2001 Procedure is Dr. Glunk's "Reappointment Profile," which was completed and signed by Dr. Noone on October 25, 2000. (Ex. P-25A at 229). The Reappointment Profile contained a supplemental notation stating that Dr. Glunk "[n]eed[s] supervision on abdominal liposuction." (Id.; 8 N.T. at 134-35). While the language is sparse, one might infer that the notation was meant to include all abdominal liposuction procedures. However, I need not resolve the ambiguity. Dr. Glunk was never sent a copy of the Reappointment Profile. (See Finding of Fact No. 52). Therefore, based on this document, Dr. Glunk could not have known that the concerns of the MLH System might include all abdominal liposuction procedures, rather than only suction assisted/traditional liposuction.

reasonable, which contributes to the credibility of Dr. Glunk's testimony;

(2) when Dr. Glunk met with Amy and Mrs. Fledderman prior to the 2001 Procedure, he subjectively believed that the MLH System limitation applied only to abdominal procedures employing the traditional liposuction technique;

(3) therefore, Dr. Glunk lacked the fraudulent intent in failing to disclose the existence of any monitoring requirement for ultrasonic liposuction procedures that may have been imposed by the May 15, 2000 Letter.[27]

In other words, the Plaintiffs have failed to prove, with respect to the state of Dr. Glunk's surgical privileges immediately prior to the May 2001 Procedure, that Dr. Glunk made a material factual omission regarding the safety of his private office or that any omission was made knowingly and with a fraudulent intent.

### b. the Quad ASF requirements.

Dr. Glunk testified that in connection with his representation to Amy Fledderman that the 2001 Procedure could be conducted as safely in his private facility as in a hospital, he likely referred to a Quad ASF study concluding that the surgical risks were the same for Quad ASF certified offices as compared to hospitals.[28] I have credited that testimony. See Finding of Fact No. 70.

---

[27]    The MLH System's reconsideration of its initial decision to limit Dr. Glunk's reappointment to one year in early 2001, see n. 19, supra, also contributes to my conclusion that Dr. Glunk subjectively believed that there was no limitation on his surgical privileges with respect to ultrasonic assisted liposuction in May 2001.

[28]    Dr. Glunk testified that his normal practice and procedure was to tell patients that a Quad ASF study showed that "quad ASF centers would essentially be equivalent in safety to a hospital or surgery center." (9 N.T. at 81). While Dr. Glunk did not specifically remember referencing the Quad ASF study to Amy and Mrs. Fledderman, he stated that he "would guess" that he mentioned either "studies" or the Quad ASF study. (10 N.T. at 7).

The Plaintiffs assert that Dr. Glunk's reference to the Quad ASF was fraudulent because his facility had not been certified by the Quad ASF prior to the 2001 Procedure. Mrs. Fledderman stated that if she had known that a hospital was a safer location for the 2001 Procedure than Dr. Glunk's office, she would have recommended that the 2001 Procedure be performed in a hospital and would not have loaned Amy the money she need for the procedure (if Amy had not followed that recommendation). (2 N.T. at 179-80).

Dr. Glunk responds that his reference to the Quad ASF study was appropriate (and thus, not misleading) because he believed his office was compliant with the guidelines of the Quad ASF. (6 N.T. at 107). Moreover, although Dr. Glunk had not received certification at the time of the 2001 Procedure, his application was pending at the time. (Ex. D-18; 5 N.T. at 16; 20-21).[29]

I conclude that Dr. Glunk's reference to the Quad ASF study is not actionable under 11 U.S.C. §523(a)(2).

The Plaintiffs make a fair point in questioning Dr. Glunk's application of the Quad ASF study findings to his unaccredited facility. The reference to the Quad ASF study regarding certified facilities is somewhat misleading. However, considering the subject of the discussion, i.e., the relative safety of ASF facilities and hospitals, I am satisfied that Dr. Glunk considered it appropriate to mention the study, even absent the accreditation, based on his belief that his facility

---

[29]    Plaintiffs suggest that Dr. Glunk's response is "self-defeating" because he claims that he believed his facility was comparable to facilities certified by the Quad ASF, yet he simultaneously claims that he did not have to comply with the state law licensing requirements. See 35 Pa. Cons. Stat. §448.802a; 28 Pa. Code §551.3. I reject this argument. Certification by a private, professional trade organization is distinct from state licensing requirements. I find it plausible that Dr. Glunk intended to conform his facility to Quad ASF certification requirements while at the same time asserting that his facility fell outside the definition of an ASF under the Pennsylvania licensing regulations. Other issues relating to the licensing of Dr. Glunk's facility are discussed infra at Section IV.B.3.

was equivalent to an accredited one. I do not perceive an intent to deceive here.

In addition, I find that the Plaintiffs did not establish the element of reliance on the misrepresentation. I do not believe that either Amy or Mrs. Fledderman actually relied upon the reference to the Quad ASF study in making the decision to authorize Dr. Glunk to perform the 2001 Procedure in his private facility instead of a hospital. Amy Fledderman had a prior invasive surgery two years earlier in that same office and, presumably, emerged as a satisfied patient because she returned to Dr. Glunk for a consultation regarding another, similar surgery. Given that history, I cannot find that Dr. Glunk's reference to the Quad ASF study played a material role in either Amy's decision or Mrs. Fleddermans' advice to her daughter.

### c. procedures Dr. Glunk performed at his private facility

Plaintiffs also argue that Dr. Glunk misrepresented the safety of his private facility and manifested the requisite fraudulent intent because he knowingly performed procedures in his private facility that would have been inappropriate even for a properly licensed ASF. In support of this argument, the Plaintiffs point to allegations in a regulatory complaint against Dr. Glunk that the DOH drafted after it completed its investigation ("the Draft Complaint"). (See Ex. P-V). In particular, the Plaintiffs point out that Dr. Glunk performed procedures that substantially exceeded four (4) hours of operating time or that resulted in extensive blood loss. Plaintiffs suggest that the court should find it implausible that Dr. Glunk reasonably "believe[d] he could perform such intensive, invasive, lengthy, risky surgery in an unlicensed facility unless the operating room was used 'solely' for surgery." (Pls.' Reply at ¶10).

I am unpersuaded by this argument. Although the DOH Draft Complaint was admitted

-38-

into evidence over Dr. Glunk's objection, without further evidence regarding the methodology of

the prior DOH investigation and further proof supporting the allegations in the Draft Complaint,

the evidence was not compelling.  In other words, while the Draft Complaint passed the modest

evidentiary threshold for admissibility under the rules of evidence, see Fed. R. Evid. 401; Beech

Aircraft Corp. v. Rainey, 488 U.S. 153, 169 (1988); New Jersey Turnpike Authority v. PPG

Industries, Inc., 197 F.3d 96, 110 n.20 (3d. Cir. 1999), standing by itself, and without further

corroborative evidence, it is insufficient to convince me that I should adopt its adversarial

allegations as findings of fact.  In short, I have considered it, but find its probative value to be

limited.

Therefore, the factual underpinning of Plaintiffs' argument – that Dr. Glunk routinely

performed procedures in his office in a manner that was inconsistent with the limitations of an

ASF – is lacking.  As a result, I am unwilling to find that Dr. Glunk knew he was operating his

office in a manner outside of the limitations of an ASF imposed by DOH regulations and that he

therefore, knew and failed to disclose that his office was less safe than a hospital.

### 2.  Did Dr. Glunk misrepresent his facility as affiliated with the MLH System?

Aside from their claims that Dr. Glunk made various misrepresentations regarding the

relative safety of his office facility and a hospital, the Plaintiffs argue that Dr. Glunk made a

number of other fraudulent misrepresentations.  The first is that the Plaintiffs' claim that Dr.

Glunk fraudulently misrepresented his private surgical facility as affiliated with the MLH System

and that they relied upon this material omission. (Pls.' Proposed Findings at ¶¶87-96).[30]

---

[30]     Mrs. Fledderman testified that it was critical that her daughter's surgeon be someone
(continued...)

-39-

At the core of this contention is the 2001 Consent Form that Dr. Glunk gave to Amy
Fledderman for her signature with the MLH System logo at the top. According to Mrs.
Fledderman, Dr. Glunk advised them during the May 15, 2001 Consultation that the 2001
Consent Form was "required by the hospital." (2 N.T. at 51-52). (Coincidentally, the 2001
Consent Form is identical to the consent form Mrs. Fledderman signed for the 1999 Procedure
when Amy was a minor). The Plaintiffs claim that Dr. Glunk never mentioned that his private
office was not affiliated with the MLH System. Mrs. Fledderman testified that had she known Dr.
Glunk's private office was not affiliated with the MLH System, she would have not recommended
that Amy have the 2001 Procedure at that facility, and if Amy had not followed that
recommendation, she would have not loaned her the money for the 2001 Procedure. (2 N.T. at
53-54).

In response, Dr. Glunk conceded that he was guilty of careless administrative practices in
his private office, but denied that he intended to mislead or defraud Amy Fledderman.

Because Dr. Glunk maintained staff privileges at Lankenau, Bryn Mawr, Paoli and Mercy-
Haverford hospitals, as well as at the Paoli Surgi-Center, he kept consent forms for each of those
hospitals at his private office as he saw most of his patients in his office, not at the hospital. (9
N.T. at 119). If a patient agreed to permit Dr. Glunk to perform a procedure in his office, Dr.
Glunk used the MLH System consent forms because he relied upon the efficacy of their content.
However, when doing so, he had a standard instruction for his office staff to "correct" the MLH
System form by affixing a sticker over the MLH System logo, substituting a reference to his

---

[30](...continued)
employed by large hospital system, such as the MLH System or one of the local university hospitals. (2
N.T. at 15-16).

private practice for the MLH System logo.  (9 N.T. at 122-23).

There is some reason to question Dr. Glunk's explanation.  The DOH's investigation

identified 38 uncorrected forms used by Dr. Glunk in 2001 from all 38 patient records he made

available.[31]  Also, Dr. Glunk did not present any evidence of instances in which his office

corrected the forms by placing a sticker cover the MLH System logo on consent forms given to

---

[31]      The statistical significance of the 38 uncorrected forms is uncertain because the parties did
not fully develop the record regarding the scope of the DOH investigation.

        The DOH requested records of patients who had undergone surgical procedures in the
calendar year of 2001.  In total, the DOH requested 38 patient records and identified 38 forms that Dr.
Glunk used for patients who had procedures at his office that were not for "Main Line Plastic Surgery."
(Ex. P-12 at 4784-85; 1 N.T. at 85-86; 90).  Plaintiffs argue that Dr. Glunk deliberately used the wrong
forms for every surgical procedure in his office.  They draw this inference because they believe that the
DOH requested records for patients who had "undergone surgical procedures in the operating room in
calendar year 2001."  (Ex. P-12 at 4784).

        Dr. Glunk suggests that the DOH's findings were merely coincidental – that the DOH
happened to select "the only 38" forms that were uncorrected.  (10 N.T. at 45).  Dr. Glunk contends that
the 38 incorrect forms were all for patients seen at the office, but they were not all of the patients who were
seen at the office in 2001.  (Id. at 46-48).  Dr. Glunk claims that the DOH had access to between 1,000-
1,500 patient files when it conducted its review of files maintained at Dr. Glunk's office.  (Id. at 45, 75)
Dr. Glunk further argues that in at least 1,000 procedures performed in his office, there were at least three
forms (the Consent Form, the Discharge Instructions and the Nursing Operative Note) that could have
incorrectly displayed a reference to or title of Main Line Health System or a similar incorrect statement.
(Id. at 74-76).  Thus, there were at least 3000 potentially incorrect forms that could have appeared in Dr.
Glunk's patient files.  (See Debtor's Proposed Findings ¶4).  Dr. Glunk therefore suggests that the 38
uncorrected forms identified by the DOH represent only approximately 1.2% of the 3,000 forms that are
actually contained in thefiles located at Dr. Glunk's office, all of which were made available to the DOH.
(10 N.T. at 75).

        The record does not permit me to resolve this factual dispute.  Based on Exs. P-V and P-
12 at 4784-85, I am unable to discern the scope of the DOH record review.  The DOH itself stated only
that it reviewed "all available documents and information relating to the procedures performed in Dr.
Glunk's operating room"; these files included "patient records, the operating room log submitted by Dr.
Glunk, documents concerning the treatment of Amy Fledderman and various materials and information
from you."  (Ex. P-O at 4818).

        In any event, for the reasons stated in the text, infra, I find it unnecessary to resolve this
issue.

-41-

other patients.  The record shows that his office failed to do so on both occasions that he

performed surgery on Amy Fledderman.

However, I cannot infer an intent to defraud Amy Fledderman solely on the basis of Dr.

Glunk's use of these forms.  I consider it unlikely that Dr. Glunk consciously decided to mislead

his patients into believing that his private practice was actually a hospital facility.  Other than this

one aspect of his office protocol, nothing else suggests that Dr. Glunk was blurring the line

between the MLH System and his private practice, much less purposefully so.  He chose the trade

name of his medical practice before the MLH System even existed.  There was no MLH System

logo or insignia outside or inside Dr. Glunk's building or office.  (2 N.T. at 144; 4 N.T. at 87-

89).[32]  Both checks Mrs. Fledderman wrote for the 2001 Procedure were payable personally to

Dr. Glunk, not to the MLH System.  (2 N.T. at 145-46).

Nor am I convinced that either Amy or Mrs. Fledderman relied on the erroneous belief

that Dr. Glunk's facility was owned and operated by the MLH System.  To the extent that the

decision to have Dr. Glunk perform the procedure in his private facility was driven by the "good

name" of "Main Line Health," the Fleddermans' desire was to have the surgical procedure

performed by a doctor affiliated with a top university hospital or health system.  The fact is that

Dr. Glunk was such a doctor; he was on the staff and had surgical privileges at several MLH

System hospitals.  As factfinder, I am unable to draw the additional inference that it mattered to

either Amy or Mrs. Fledderman that Dr. Glunk's private practice was not owned and operated by

---

[32]       I am aware that the "trade name" Dr. Glunk used for his private practice at the time,
"Main Line Plastic Surgery and Laser Associates, Ltd.," is similar to the "Main Line Health" name used
by the hospital system.  However, Dr. Glunk explained that he named his private practice before the
hospital system chose the similar sounding name.  (5 N.T. at 22-23).  Also, there are likely hundreds of
business in that region that employ the words "Main Line" in their trade names.

the the MLH System.

I do not condone Dr. Glunk's lack of care regarding the accuracy of the consent forms. Dr. Glunk testified that he did not think it was important or significant to ensure that a patient received the appropriate consent forms that correctly identified his practice as compared to the MLH System. (5 N.T. at 31-32). Nevertheless, despite his cavalier, unprofessional attitude, I conclude that Dr. Glunk did not intentionally defraud the Fleddermans into believing that his office was owned and operated by the MLH System.

### 3. Did Dr. Glunk make a material misrepresentation by failing to disclose that his private office was not licensed by the Commonwealth of Pennsylvania?

There is no dispute that Dr. Glunk did not have a license from the Commonwealth of Pennsylvania to operate his office as an ASF in 2001, (5 N.T. at 15),[33] and the Plaintiffs do not allege that Dr. Glunk told Amy Fledderman that his facility was licensed. Rather, the Plaintiffs claim that Dr. Glunk fraudulently omitted disclosing that the facility was unlicensed. The Plaintiffs further claim that if Mrs. Fledderman had known that Dr. Glunk's office was not licensed, she would have advised Amy not to undergo the procedure and Amy would have followed that advice. (2 N.T. at 48-49).

In response, Dr. Glunk acknowledges that he was aware of the Pennsylvania statute and regulations pertaining to ASF's, but states that he did not believe that it applied to his facility in

---

[33]     Prior to trial, I entered an order precluding Dr. Glunk from contesting the fact that his private facility was an ASF that required a license under Pennsylvania law. This decision was based on the doctrine of collateral estoppel because the identical issue had been tried and resolved adversely to Dr. Glunk during the State Court Action. (See Order dated Oct. 1, 2009, Doc # 107).

2001. (9 N.T. at 129-30, 135).[34]  In forming this view in 2001, he relied upon the opinion of an

attorney and an architect, as well as his own interpretation of the applicable statute and

regulations. (Id. at 130-33; 35 Pa. Cons. Stat. §448.802a; 28 Pa. Code §551.3).

Dr. Glunk believed that his office was not an ASF under Pennsylvania law because no

portion of his private office was used "solely" for the performance of ambulatory surgery and the

relevant statute excludes from the licensure requirements any private doctor's office that does not

have a distinct part used solely for ambulatory surgery.  (Id. at 130-31; 1.N.T. at 135-39).[35]  Dr.

Glunk also testified that if he knew he needed a license, he would not have been performing

surgeries at his office without one.  (Id. at 138-39).  Recognizing that this issue has been resolved

adversely to him, see n.33, supra, Dr. Glunk contends that because his belief that Pennsylvania

law did not require that he obtain an ASF license for his facility was subjectively sincere, his

nondisclosure of the absence of a license was neither knowing nor motivated by a fraudulent

intent to deceive.

_____

[34]    In fact, despite the court's finding prior to the trial that Dr. Glunk's private facility was an
ASF within the meaning of Pennsylvania law at all relevant times, Dr. Glunk continued to contend during
the trial that his facility did not require a license. (9 N.T. at 129-30, 135).

[35]    35 Pa. Cons. Stat. §448.802a defines an ASF as:

> A facility or portion thereof not located upon the premises of a hospital which
> provides specialty or multispecialty outpatient surgical treatment. Ambulatory
> surgical facility does not include individual or group practice offices of private
> physicians or dentists, unless such offices have a distinct part used solely for
> outpatient surgical treatment on a regular and organized basis. For the purposes of
> this provision, outpatient surgical treatment means surgical treatment to patients
> who do not require hospitalization, but who require constant medical supervision
> following the surgical procedure performed.

(emphasis added).

-44-

I am convinced by Dr. Glunk's response. His interpretation of the ASF definition in 35 Pa. Cons. Stat. §448.802a is exceedingly narrow and at odds with the purposes of the statute, but it is not a totally implausible reading of this badly drafted statutory provision. After observing Dr. Glunk over an extended period of this trial, both on and off the witness stand, I have no difficulty believing that he convinced himself of the righteousness of his strained interpretation of the Pennsylvania licensing statute. Nor does it surprise me that he would attempt to take advantage of a possible loophole in the state's regulatory system to avoid the minimal burden of licensure. During the trial, he defended his position on this issue, as well as other issues, with an unseemly adversarial intensity. But whatever value judgments one might make regarding Dr. Glunk's personality traits and unabashed commitment to taking advantage of a legal loophole, there was a basis, albeit slim, for his position that his facility did not require a license. This convinces me that his position was sincere, see n.36, infra, and that he lacked any fraudulent intent in failing to obtain an ASF license for his private facility and in failing to disclose the lack of licensure to his patients, including Amy Fledderman.

The Plaintiffs argue that Dr. Glunk's response is predicated upon a "mistake of law," which is a legally insufficient defense. (Pls.' Reply at ¶¶9-10). The Plaintiffs contend that Dr. Glunk cannot negate his intent to defraud under §523(a)(2)(A) purely on the basis of his legally erroneous interpretation of the statutory definition of an ASF.

Respectfully, I disagree with the Plaintiffs.

A "mistake of law" defense might be ineffective in certain criminal prosecutions, in which the criminal statute lacks a "specific intent" requirement as an element of the crime. But this is a civil fraud case, in which the Plaintiffs must prove, inter alia, the debtor's knowledge of a fact he

-45-

knew to be false, as well as his intent to deceive. See Part IV.A, supra. Here, these elements

require proof that Dr. Glunk both (1) knew that his office surgical facility was required to be

licensed by the Pennsylvania Department of Health and (2) with an intent to defraud Amy

Fledderman, did not tell her that he was operating an unlicensed facility. Indeed, as the Court of

Appeals observed in United States v. Zehrbach, 47 F.3d 1252 (3d Cir. 1995) (en banc), a case

cited by the Plaintiffs, in criminal prosecutions in which "proof of knowledge of illegality is an

element of the government's prima facie case . . . . mistake of law is a complete defense." Id. at

1261.

     The decisive element here is Dr. Glunk's lack of knowledge that the law required that his

office be licensed. Like the prosecution in Cheek v. United States, 498 U.S. 192 (1991), a

criminal proceeding for willful tax evasion (another case cited by the Plaintiffs), the Plaintiffs here

had to prove that Dr. Glunk "was aware of the duty at issue, which cannot be true if [the

factfinder] credits a good-faith misunderstanding." Id. at 202. Here, I have found that Dr. Glunk

was unaware of his duty because he subjectively believed that he was not subject to the licensure

requirement.[36] This negates the Plaintiffs' fraud claim with respect to license issue. Without the

subjective knowledge of his legal duty to license his facility, Dr. Glunk lacked the requisite intent

---

[36]     In Cheek, the Supreme Court also observed that "the more unreasonable the asserted
beliefs or misunderstandings are, the more likely the [factfinder] will consider them to be nothing more than
simple disagreement with known legal duties imposed by the tax laws and will find that the Government has
carried its burden of proving knowledge." 498 U.S. at 203-04. In making my findings of fact, I did
consider the degree of "reasonableness" of Dr. Glunk's understanding of the law and found it sufficiently
plausible to warrant crediting his testimony that he did not believe his office was subject to the licensure
requirement.

to deceive.[37]

### 4. Did Dr. Glunk misrepresent the risks of the 2001 procedure?

The Plaintiffs claim that Dr. Glunk fraudulently misrepresented the overall risks of the

2001 Procedure. (Pls.' Proposed Findings at ¶¶53-70). I find that Dr. Glunk made no fraudulent

misrepresentation regarding the surgical risks prior to the 2001 Procedure.

Mrs. Fledderman was an active participant during the May 15, 2001 Consultation and had

very specific questions for Dr. Glunk, particularly regarding the safety of the proposed surgical

procedure. She asked Dr. Glunk whether liposuction was a "safe procedure" and she claimed that

Dr. Glunk assured her that it is. (2 N.T. at 36-37). Mrs. Fledderman also raised specific concerns

including blood clots and blood loss and claimed that Dr. Glunk told her not to worry about those

things and that the worst possible risk is a temporary drool, which he could repair with minor

surgery. (2 N.T. at 37-40, 129-30). Mrs. Fledderman said that when she asked about the risk of

death, Dr. Glunk explained that only one of his patients had died, but that her death was unrelated

to the procedure because it resulted from the patient's drug abuse and mixture of pain

medications. (2 N.T. at 39-40; 9 N.T. at 29-30). Mrs. Fledderman also testified that Dr. Glunk

---

[37]        The other cases Plaintiffs cite are inapposite. In re Nazario, 228 B.R. 394 (Bankr. W.D.
Pa. 1999) involved the question of the enforceability of a contract that a party entered into allegedly based
upon a mistake of law. In re Livingston, 389 B.R. 1 (E.D. Mich. 2008) affirmed a bankruptcy court's
determination that a debt was nondischargeable based on a prior state court judgment and the application of
the doctrine of collateral estoppel. In re Richardson, 178 B.R. 19 (Bankr. D.D.C. 1995) involved
"defalcation" under §523(a)(4), not fraud under §523(a)(2), and the court found the debt nondischargeable
notwithstanding the debtor's mistaken understanding of the law because the debtor was a fiduciary who
was held to a higher standard and charged with knowing the law.

never mentioned anything regarding a fat embolism, permanent injury, or death,[38] and went so far

as to claim that Dr. Glunk actually stated that Amy Fledderman had "zero risk." Mrs. Fledderman

claimed that Dr. Glunk advised that Amy had "zero risk" because she was a young, healthy athlete

in excellent shape. (2 N.T. at 37-40).[39] Dr. Glunk denies that he ever used the words "zero risk."

I credit much of Mrs. Fledderman's testimony regarding the content of Dr. Glunk's

medical advice during the May 15, 2001 Consultation.

I accept Mrs. Fledderman's testimony insofar as she described her role in the May 15,

2001 Consultation as actively facilitating the discussion with Dr. Glunk by posing several

questions to him. I also accept her testimony that Dr. Glunk represented that liposuction is a safe

---

[38]     Mrs. Fledderman testified as follows:

> Q: Was there any information provided to you during this meeting in Dr. Glunk's office,
> or provided to Amy in your presence by Dr. Glunk that liposuction could result in Amy's
> death?
>
> A: Absolutely not . . . .

Mrs. Fledderman's suggestion that Dr. Glunk never mentioned "death" during the May 15, 2001
Consultation is inconsistent with her testimony that Dr. Glunk told her about a patient who died from
misuse of pain medications. As described above, Dr. Glunk explained that one patient died as a result of a
drug overdose of pain medication. While the statement regarding the prior patient can be harmonized with
the Plaintiffs' position that Dr. Glunk misrepresented the risks of surgery (because the point of the anecdote
was that the patient died from causes other than the surgery), it nonetheless is an overstatement to say that
death was never mentioned.

[39]     In further support of their claim that Dr. Glunk fraudulently misrepresented that death and
a fat embolism was not a risk, the Plaintiffs point to two additional pieces of evidence. First, there is no
reference to the risk of death or other serious injury on the consent form Dr. Glunk provided to them for
Amy Fledderman's signature. (Ex. P-E.). Second, in his dictation following the May 15, 2001
consultation, Dr. Glunk did not mention any discussion he had had regarding the possibility of a fat
embolism or death. (Ex. P-C at 10765). These omissions do not cause me to infer that Dr. Glunk said or
did anything to mislead Amy into believing that there was no risk of complication or death. I ascribe the
omission to the reality that a busy health care professional will not necessarily document every detail of the
advice provided to a patient.

procedure, particularly because he stated emphatically that Amy was a young, healthy athlete in excellent shape. However, I do not find that Dr. Glunk stated that the surgical procedure posed "zero risk" or that Amy and Mrs. Fledderman consented to the procedure based on a belief derived from Dr. Glunk's statements that there was no risk whatsoever.

The purpose of the May 15, 2001 Consultation was for Dr. Glunk to offer his medical opinion and provide Amy Fledderman with sufficient information so that she could make an informed decision regarding the benefits and risks of undergoing the liposuction procedure that she was contemplating. Risk and benefit are relative concepts that are weighed against each other; they are not absolute concepts. Undoubtedly, Dr. Glunk downplayed the risks of the procedure and conveyed the message that Amy had no reason to be anxious about undergoing this particular surgery. Nevertheless, in the course of his comments, I believe that Dr. Glunk did advise Amy and her mother, at least in general terms, that even a young, healthy patient such as Amy could still have complications from a surgical procedure. (See 9 N.T. at 94-95). It is common sense that there are simply no guarantees as to the outcome of surgery and that, in the worst-case scenario, complications can lead to a patient's death. Mrs. Fledderman is intelligent and sophisticated enough to have understood these obvious facts regarding the state of medical science. Mrs. Fledderman acknowledged as much in her testimony. (See 2 N.T. at 112-13).

While Dr. Glunk may have made statements to the effect that the procedure was safe and that Amy had nothing to worry about, his comments were nothing more than another way of stating that, in his opinion, the risks of the procedure were minimal and worth taking in order to achieve the benefits of the surgery. This expression of his professional opinion was not the same as representing the surgery as "zero risk," and I do not believe that Dr. Glunk used those words.

-49-

Amy Fledderman and her mother did not rely on a statement that the surgery had "zero risk," but rather on Dr. Glunk's advice that the liposuction procedure he proposed to perform was a safe procedure. The record does not support a finding that any of Dr. Glunk's representations regarding the surgical risks was either false or fraudulent.

### 5. Did Dr. Glunk make misrepresentations regarding the anesthesia services for the 2001 Procedure?

The Plaintiffs allege that Dr. Glunk made two fraudulent misrepresentations in connection with the anesthesia care that Amy Fledderman would have for the 2001 Procedure.

### a. the presence of an anesthesiologist

Plaintiffs first claim that Dr. Glunk fraudulently misrepresented that an anesthesiologist would be present during the 2001 Procedure when, in actuality, a CRNA was present. (Pls. Proposed Findings at ¶¶97-106). Much of this dispute focused on whether Amy Fledderman was given the option between an anesthesiologist and a CRNA, and on who obtained Amy Fledderman's consent.

Dr. Glunk testified that it was his custom and practice to explain the options for anesthesia personnel and that he made the choice between an anesthesiologist or a CRNA for office-based surgery known to all of his patients. (9 N.T. at 80-83). Dr. Glunk claims that he gave Amy Fledderman the choice and believed that she knowingly chose to use Mr. DeStefano again because she and her mother were happy with the results of the 1999 Procedure and it was less

costly to use a CRNA than an anesthesiologist. (9 N.T. at 82, 84, 88-90).[40]

According to Mr. DeStefano's testimony, when he first met Amy and Mrs. Fledderman in 1999, he introduced himself, identified himself as a CRNA, and advised her that he would be providing the anesthesia. (Ex. D-19, DeStefano Dep., Apr. 8, 2003, at 168-69). To that end, Mr. DeStefano testified that he always introduces himself as a nurse and never as a doctor. (Id., DeStefano Dep., May 5, 2003, at 441-42). On the day of the 2001 Procedure, Mr. DeStefano re-introduced himself when he met with Amy and Mrs. Fledderman before the surgery and claimed that they remembered him from her prior surgery and they discussed their mutual friend, Elizabeth Gennazio. (Id., DeStefano Dep. Apr. 8, 2003, at 197). Mr. DeStefano also testified that he met with Amy Fledderman privately to provide her with the consent form and obtained her consent for the 2001 Procedure, thus corroborating Dr. Glunk's version of the events. (Id., DeStefano Dep., May 5, 2003, at 584-85).

Mrs. Fledderman's recollection was quite different. She claimed that Dr. Glunk stated during the May 15, 2001 Consultation that an anesthesiologist and two (2) nurses, in addition to himself, would be present during the 2001 Procedure. (2 N.T. at 44, 55). She claimed that she was present for the entire May 15, 2001 Consultation, that Dr. Glunk never discussed the option between a CRNA and an anesthesiologist, and that Amy Fledderman consented to the 2001 Procedure because she relied on Dr. Glunk's representation. (2 N.T. at 55-56). Mrs. Fledderman

_____

[40]     To rebut any suggestion that all of his patients chose a CRNA rather than an anesthesiologist, with the additional implication that he did not provide his patients with the choice of anesthesia provider, Dr. Glunk called Dr. Joseph Olivia, a board certified anesthesiologist licensed in Pennsylvania and New Jersey, to testify. Dr. Olivia testified that he provided anesthesia services to Dr. Glunk's office-based patients approximately six to twelve (6-12) times between 1999 and 2001. (7 N.T. at 8-9). Dr. Olivia also testified that he understood that Dr. Glunk did not use his services more often because Dr. Glunk's patients preferred the less expensive anesthesia option of a CRNA. (Id. at 10).

also claimed that Dr. Glunk provided them with the 2001 Anesthesia Consent Form at the May

15, 2001 Consultation, but that Amy did not sign it at that time because Dr. Glunk said he did not

know which "doctor" would be administering the anesthesia. For this reason, the name of the

doctor was not filled in on the anesthesia consent form.  (Ex. P-F; 2 N.T. at 57).  And, contrary to

Mr. DeStefano's testimony, Mrs. Fledderman said that he never introduced himself as a CRNA.

She acknowledged, however, that he did not introduce himself as "Dr. DeStefano" and that she

never inquired about his credentials.  (2 N.T. at 78, 155, 157, 160).  To a certain extent, she also

corroborated Mr. DeStefano's testimony that the connection to Ms. Genazio came up during the

discussion with him.  (2 N.T. at 107-08).  Yet, she claimed that she did not learn that Mr.

DeStefano was a CRNA until a week after Amy died.  (2 N.T. at 107-08).

Resolution of this issue turns on credibility and I find that the scale tips in Dr. Glunk's

favor.  I am not suggesting that I entirely discredit Mrs. Fledderman's testimony and version of

the story.  However, my common sense and experience[41] tell me that because surgeons must

repeatedly obtain informed consent before performing surgical procedures on the hundreds of

patients that they see in their practices, they necessarily develop a standard disclosure speech,

which includes statements regarding the potential choices in connection with anesthesia.  Here,

after weighing the evidence, I find it more likely than not that Dr. Glunk delivered such a standard

"speech" to Amy Fledderman and Mrs. Fledderman and in that speech he told them, perhaps in

passing and without much emphasis, that Amy could choose to have anesthesia provided by either

---

[41]       See generally United States v. Cavera, 550 F.3d 180, 205 (2d Cir. 2008) ("the factfinder –
whether judge or jury – [may] draw on common sense and experience in making any determination") (citing
Burden v. Evansville Materials, Inc., 840 F.2d 343, 348 (6th Cir. 1988)); Kelley v. Sun Transp. Co., 900
F.2d 1027, 1032 (7th Cir. 1990) ("the trial judge, sitting as a factfinder, was entitled to use his own
experience and common sense in determining [issues of fact]").

an anesthesiologist or a CRNA.[42]   The finding that Dr. Glunk did not misrepresent Mr.

DeStefano's status as a CRNA is further supported by Mrs. Fledderman's own testimony that she

understood the difference between an anesthesiologist and a nurse anesthetist, (2 N.T. at 55), that

Mr. DeStefano had provided the anesthesia services in Amy's prior surgery, and that she (Mrs.

Fledderman) remembered him from the prior procedure.

Even if Dr. Glunk failed to accurately counsel Amy Fledderman about her option between

an anesthesiologist and a CRNA, or used the word "doctor" in reference to the anesthesia service

provider, I cannot believe it was purposeful and done with the intent to defraud Amy into

undergoing surgery.  I perceive no incentive for Dr. Glunk to fraudulently misrepresent this

information to Amy Fledderman, or any patient, for that matter.  Dr. Glunk's fee was the same

irrespective of whether he used an anesthesiologist or CRNA.  (9 N.T. at 92).[43]  Finally, while

there was some conflicting testimony regarding the identity of the specific person who ultimately

---

[42]      As corroborative evidence, Dr. Glunk produced his "Operating Room Record" form,
which provides two (2) separate lines: one for the name of the anesthesiologist and the second for the name
of the CRNA. (Ex. D-16). Dr. Glunk points out, logically, that there would be no purpose in providing
two different lines on the record if the patient were not given a choice between the types of service
providers. (9 N.T. at 90-91). The Plaintiffs ask me to disregard this evidence. They argue that I should
infer that Dr. Glunk was not the original author of this form, just as he was not the author of other forms he
"borrowed" from the MLH System. However, regardless of the identity of the author of the form, the only
evidence presented was that Dr. Glunk used the form in his practice, which tends to support his testimony
that he offers patients a choice of anesthesia provider. In any event, even without consideration of Ex. D-
16, I found Dr. Glunk's testimony credible on this issue.

[43]      The Plaintiffs dispute the notion that Dr. Glunk did not have an incentive to misrepresent
the qualifications of the anesthesia providers. They suggest that Dr. Glunk had a financial interest in using
CRNAs, because he could offer the entire procedure at a lower rate while creating the impression that
patients would receive a higher degree of care, thus making it more likely the patient would consent to the
procedure. (Pls.' Reply at ¶37). The theory is not impossible, but without some other evidence suggesting
that Dr. Glunk was prepared to actively mislead his patients regarding their medical options purely for
personal financial gain, I find that the theory does not rise beyond mere speculation.

-53-

obtained Amy Fledderman's signature consent for the anesthesia services, I find that dispute to be

immaterial for purposes of determining whether Dr. Glunk committed fraud.

### b.  the type of anesthesia administered to Amy Fledderman

The Plaintiffs claim that Dr. Glunk fraudulently misrepresented the type of anesthesia Amy

Fledderman would have for the 2001 Procedure. (Pls.' Proposed Findings at ¶¶107-22).

According to Mrs. Fledderman, Dr. Glunk advised that MAC would be administered.  The

Plaintiffs contend that Amy Fledderman actually received general anesthesia.[44]  While the parties

---

[44]      The Plaintiffs' contention is grounded in the conclusions of their expert witnesses, Drs.
Dombrowski and Felice. (3 N.T. at 62).  In explaining how general anesthesia is the deepest form of
anesthesia, but that it can be provided in many ways, Dr. Dombrowski wrote:

> Traditionally, [general anesthesia] is thought of as involving the use of an
> endotracheal tube, a muscle relaxant, and inhalation agents.  However, general
> anesthesia can also be performed with the use of intravenous medications, such as
> propofol.

(Id. at 3).

        Dr. Dombrowski's report concluded that Mr. DeStefano actually provided general
anesthesia to Amy Fledderman in a less traditional way (without an endotracheal tube or airway
management). (Ex. P-6 at 3-4).  He based his conclusion on the types of medications she received, the
length of the case, the type and number of procedures that were being performed. (Id.; 3 N.T. 63-65, 69-70,
135-36).

        In his testimony, Dr. Dombrowski explained that, in addition to being given Fentanyl (a
synthetic narcotic) and Versed (an anesthetic), Amy Fledderman was given an infusion of Propofol. (He
also stated that the nurses said she was asleep and "asleep is not MAC").  Dr. Dombrowski reported that
anesthesia reversal medications are used very infrequently and he has never heard of them being used in
conjunction with MAC. (3 N.T. at 67-68).  Yet, such reversal medications were used during the 2001
procedure, thereby indicating to Dr. Dombrowski the use of general anesthesia. (Id. at 68-69, 115).
However, Dr. Dombrowski also acknowledged that one cannot definitely state whether Amy Fledderman
had received anesthesia that was equivalent to general anesthesia without having been present. (3 N.T. at
110).

        Dr. Felice concurred that a liposuction of the abdomen, flanks, and neck scheduled to take
3 ½ to 4 hours should be performed under general anesthesia and would be very difficult to accomplish

(continued...)

-54-

focused their dispute over the type of anesthesia Amy Fledderman received during the 2001

Procedure, it is unnecessary for me to decide whether, in fact, the anesthesia was MAC or

general. Instead, resolution of this issue turns on Dr. Glunk's state of mind.

It is undisputed that Dr. Glunk always represented that Amy Fledderman was to receive

MAC during the 2001 Procedure. Dr. Glunk acknowledged that he made this representation and

it is further supported by the 2001 Anesthesia Consent Form he provided for Amy Fledderman's

signature. (Ex. P-F; 9 N.T. at 139; 2 N.T. at 74-75, 176-77). As Mrs. Fledderman explained,

even when Dr. Glunk presented the 2001 Anesthesia Consent Form, he specifically represented

that Amy was going to have MAC and that she would be slightly out, not "completely under"

general anesthesia. (Ex. P-F; 2 N.T. at 58; 9 N.T. at 139). Mr. DeStefano also testified the he

intended to provide MAC to Amy Fledderman and did so during the 2001 Procedure. (Ex. D-19,

DeStefano Dep., Apr. 8, 2003, at 32, 204; State Court Action, Direct Exam., May 15, 2008, at

112-14).

Most significant to me was Dr. Dombrowski's testimony. Dr. Dombrowski explained that

a procedure can start out as intended to be MAC, but might end up "someplace else" (i.e., general

anesthesia). (3 N.T. at 58). He explained that it is appropriate for some surgeries to bring the

level of MAC anesthesia to a level just above general anesthesia and that anesthesia can "bump"

into unconsciousness even if that is not intended. (Id. at 128-29). He also acknowledged that

there is no indication anywhere in Mr. DeStefano's surgical notes suggesting an intention to

provide Amy Fledderman with a level of anesthesia that constitutes general anesthesia. (Id. at

---

[44](...continued)
under MAC. (4 N.T. at 69-70).

106, 115).

Based on the record as a whole, I cannot find that Dr. Glunk intended to provide Amy Fledderman anything other than MAC, irrespective of whether she slipped into a state akin to general anesthesia, thus necessitating the use of reversal medications. Therefore, the Plaintiffs have not met their burden of proof as to their claim that Dr. Glunk fraudulently misrepresented the type of anesthesia he intended to have administered to Amy Fledderman during the 2001 Procedure.

### 6.  Did Dr. Glunk make misrepresentations concerning the 1999 Procedure

Finally, the Plaintiffs claim that Dr. Glunk misrepresented that the 1999 Procedure occurred without complication. (Pls.' Proposed Findings at ¶¶123-32).  The central inquiry on this issue involved the concept of a "rough emergence" from anesthesia: whether Amy Fledderman had a "rough emergence" during the 1999 Procedure and whether Dr. Glunk knew about the "rough emergence" prior to the May 15, 2001 Consultation.

As some patients emerge from anesthesia, they become combative, thrash around, and fail to respond to commands in a purposeful manner.  Such behavior is referred to as a "rough emergence." (3 N.T. at 70-71; 4 N.T. at 71).  A rough emergence is uncommon, but obvious when it occurs, and would be apparent to a surgeon.  (4 N.T. at 70-73; 3 N.T. at 71-72).

Mrs. Fledderman testified that Dr. Glunk first advised her that Amy had experienced a "rough emergence" during the 1999 Procedure while Amy was still in the operating room following the 2001 Procedure.  (2 N.T. at 59-61).  Mrs. Fledderman claims that had she known about Amy's rough emergence from anesthesia in 1999, she would have not recommended the

2001 Procedure to Amy or lent her the money in the event she chose to go through with it against

her mother's advice. (2. N.T. at 58-59).

There is conflicting evidence whether Dr. Glunk actually knew about the 1999 "rough

emergence" prior to the 2001 Procedure. Dr. Glunk testified that he deemed the 1999 Procedure

a success without complication. (9 N.T. at 78). He also stated initially that he did not learn about

Amy Fledderman's problems emerging from anesthesia in 1999 until after he had completed the

2001 Procedure and had spoken with Mrs. Fledderman in the waiting room. He testified that he

then went back to the operating room and Mr. DeStefano told him about the 1999 rough

emergence. (9 N.T. at 128-29). However, on cross-examination, Dr. Glunk could not remember

for certain whether he was aware of the rough emergence at the time he met with Amy

Fledderman and her mother in 2001. (10 N.T. at 50-52).

Again, this issue turns on whether the preponderance of the evidence supports a finding of

fraudulent intent. Despite Dr. Glunk's uncertain testimony, I resolve this issue in his favor after

considering the record as a whole and the respective burdens of proof.

The Plaintiffs' experts described a "rough emergence" as an event that one cannot miss

and Dr. Glunk was unequivocal that he did not personally observe a "rough emergence" in 1999.

(3 N.T. at 73; 9 N.T. at 127). The absence of any notation regarding a "rough emergence" in the

1999 anesthesia records is significant and supports Dr. Glunk's testimony that he was unaware of

the event prior to the 2001 Procedure.[45] (Ex. D-19, DeStefano Dep., Apr. 8, 2003, at 176-77;

---

[45]    I can only infer that Mr. DeStefano orally brought to Dr. Glunk's attention Amy
Fledderman's prior 1999 "rough emergence" at the time they were trying to awaken her following the
surgical procedure in 2001.

State Court Action, Cross-Exam., May 8, 2008, at 49-52; 3 N.T. at 124; 10 N.T. at 50). Dr.

Glunk further explained that after discussing Amy Fledderman's 1999 emergence from anesthesia

with Mr. DeStefano, he understood that it was not a significant event – Amy just woke up slowly.

(9 N.T. at 140-43). According to Mr. DeStefano, Amy Fledderman "woke up like a kid" in 1999,

in that she fought it, but he did not deem it abnormal for a patient of her age. (Ex. D-19,

DeStefano Dep., Apr. 8, 2003, at 176-77).

　　　Given this record, even if I were to find that Dr. Glunk knew prior to the 2001 Procedure

of a complication Amy Fledderman had when she emerged from anesthesia during the 1999

Procedure, I would not also find that he intended to hide this information from the Plaintiffs. The

facts suggest that the event in 1999 was not a significant one that Dr. Glunk necessarily would

have remembered two years later. To the extent it was significant enough that he should have

remembered it and discussed the complication with Amy and Mrs. Fledderman in the May 15,

2001 Consultation, his error was a failure to satisfy legal requirements of informed consent, not

fraud.

## V. CONCLUSION

　　　The two most significant factual issues in this case revolved around the meaning of the

communications between the MLH Medical Administrators and Dr. Glunk regarding his surgical

privileges in the MLH hospitals and the precise content of the information Dr. Glunk conveyed to

Amy Fledderman and Mrs. Fledderman prior to the 2001 Procedure.

　　　With respect to the MLH Medical Administrators, it is surprising and somewhat disturbing

that the MLH System's historical record regarding its oversight of Dr. Glunk in 2000 and 2001 is

so muddled. The consequence is that even if Dr. Glunk had a duty to disclose the existence of limitations on his surgical privileges at MLH System hospitals, the Plaintiffs have not succeeded in proving, by the requisite preponderance of the evidence, that such a duty existed and that Dr. Glunk, knowingly and with a fraudulent intent, concealed that information from Amy Fledderman.

As for the pre-operative communications between Dr. Glunk and Amy Fledderman and Mrs. Fledderman, for the most part, I have credited Dr. Glunk's testimony with respect to the material factual disputes. This should not be interpreted as a criticism of Mrs. Fledderman. I believe that she testified truthfully and that the general outline of her narrative was accurate. However, given the emotional trauma she experienced in May 2001 and the length of time that has passed, I have sufficient doubt about the accuracy of the details she recalls regarding her interaction with Dr. Glunk prior to Amy's surgery and the details of his representations, that I cannot find that events occurred precisely as she testified. And, it is those details that are critical in proving the Plaintiffs' legal and factual theory that Dr. Glunk purposely defrauded Amy Fledderman. In the end, Mrs. Fledderman's testimony may have successfully conveyed the likelihood that Dr. Glunk fell short of his obligation to obtain Amy's informed consent before conducting the 2001 Procedure (as the jury in the State Court Action appears to have found), but her testimony did not establish that he acted fraudulently.

For the reasons set forth above, judgment will be entered in favor of Dr. Glunk and against the Plaintiffs in this adversary proceeding.

Date:   __August 11, 2011__            _____
                                        **ERIC L. FRANK**
                                        **U.S. BANKRUPTCY JUDGE**

-59-